| | |
|---|---|
| 98 | 817 |
| 100 | 862 |
| 98 | 817 |
| 101 | 850 |
| 98 | 817 |
| 102 | 176 |
| 98 | 817 |
| 106 | 519 |

# Wytheville.

## Reed v. Commonwealth.

### June 14, 1900.

1. APPEAL AND ERROR—*Entering Judgment of Appellate Court—Section 4060 of Code.*—The provision of section 4060 of the Code requiring the judgment of the appellate court to be certified to the trial court and entered by the latter as its judgment is substantially complied with by simply transcribing the judgment of the appellate court on the order book of the trial court.

2. CRIMINAL LAW—*Pleas in Abatement—When to Be Filed.*—After the plea of "not guilty," it is too late to plead in abatement, except on leave to withdraw the former plea to the merits. Such leave may be granted if it does not violate any positive rule of law or of established practice, but is seldom exercised in aid of a purely dilatory or formal defence. When refused, the action of the trial court will not be reversed unless it appears that it has abused the discretion vested in it.

3. CRIMINAL LAW—*Evidence—Two Offences at Same Time—Details of Each—Res gestæ.*—Where the killing of two people constitutes parts of the same tragedy so that a detailed statement of killing one cannot be given without also relating the killing of the other, the latter evidence is admissible as evidence of the general conduct of the slayer and as part of the *res gestæ.*

4. EVIDENCE—*Irrelevancy—Withdrawal of Question.*—It is not error to permit an irrelevant question to be withdrawn before it is answered.

5. CRIMINAL LAW—*Evidence—Murder—Prior Conduct of Prisoner.*—On a trial for murder, the whole conduct of the prisoner preceding the murder as well as after, may be shown in rebuttal of evidence of previous good conduct, in order that the jury may be in full possession of all the facts incident to the preparation for and consummation of the crime.

6. EVIDENCE—*Order of Introduction.*—The order of introduction of evidence lies in the discretion of the trial court, and its rulings in this particular will not be reversed unless it is manifest that its discretion has been abused.

7. CRIMINAL LAW—*Homicide—Degree of Offence—Presumption—Self-Control—Provocation.*—All homicides are presumed in law to be murder of the second degree, and the burden is on the Commonwealth to elevate the offence to murder of the first degree, and on the prisoner to reduce it to manslaughter. Self-control determines malice, and as long as this exists the crime is murder of the first or second degree, to be determined by other facts than the varying degrees of the provocation.

8. INSTRUCTIONS—*Jury Fully Instructed.*—All instructions, when given, are instructions of the court, regardless of who requested them, and are to be read as a whole; and if, when so read, they set forth the whole law of the case correctly and fairly, it is not error to refuse to give further instructions.

9. INSTRUCTIONS—*Evidence to Support—Abstract Propositions.*—It is not error to refuse an instruction when there is no evidence to support it, nor is it error to give such instruction if it correctly propounds the law, unless it can be seen that such instruction did mislead or might have misled the jury.

10. CRIMINAL LAW—*Verdict—Sheriff a Witness.*—The verdict of the jury in a criminal case will not be set aside merely because the jury was put in the custody of a deputy sheriff who had testified for the Commonwealth.

11. CRIMINAL LAW—*Custody of Jury—Oath of Office—Record.*—Where the record shows that, at the beginning of the trial of a criminal case, all the officers in charge of the jury were duly sworn with the usual oath to keep the jury during the trial, when in the absence of the court, it is sufficient. It is unnecessary to show that such oath was administered upon each adjournment of the court.

12. MURDER—*Drunkenness.*—Drunkenness is no excuse for, or palliation of, a homicide committed in pursuance of a wilful, deliberate, and premeditated purpose formed while sober.

Error to a judgment of the County Court of Madison county, rendered September 4, 1899, on a prosecution for murder, wherein the plaintiff in error was found guilty of murder of the first degree, and sentenced to be hanged.

                                                        *Affirmed.*

The opinion states the case.

*J. L. Jeffries* and *C. F. McMullan,* for the plaintiff in error.

*Attorney-General A. J. Montague,* for the Commonwealth.

CARDWELL, J., delivered the opinion of the court.

At the April term of the County Court of Madison county, 1899, plaintiff in error was indicted for murder of his wife, Minnie Reed. He demurred to the indictment. His demurrer was overruled, and he was thereupon arraigned and pleaded not guilty, and the case was set for trial on the fourth day of May next succeeding. The trial was then had, and a verdict of guilty of murder in the first degree was rendered, and the prisoner was sentenced to be hanged, but a writ of error was obtained from the Circuit Court which set aside the verdict, and awarded a new trial. At the July term of the County Court, the prisoner obtained a continuance of the case to the next term in August, 1899, when he was again tried and convicted of murder in the first degree; whereupon he applied to the judge of the Circuit Court for a writ of error, which was refused, and the case is before us upon a writ of error awarded by a judge of this court.

When the case was called for trial at the August term, 1899, the prisoner objected to proceeding with it on the ground that section 4060 had not been complied with, and, therefore, the case was not properly in the County Court, which objection was overruled, and the prisoner excepted.

Section 4060 of the Code provides that the judgment of the appellate court shall be certified to the court to whose judgment the writ of error was allowed, which shall cause the same to be entered on its order book as its own judgment. In this case, the judgment of the Circuit Court reversing the judgment of the County Court was transcribed upon the minute book of the County Court on the first day of its July term, 1899. We are of opinion that this was a substantial compliance with the provisions of section 4060 of the Code.

At the August term the prisoner moved the court to allow him to withdraw his plea of not guilty, entered at the April term, and to permit him to file a plea in abatement upon the ground that

two members of the grand jury who found the indictment against him were disqualified by virtue of being overseers of the road. The overruling of this motion constitutes the prisoner's second assignment of error.

It was said by this court in *Early's Case*, 86 Va. 924: "By pleading the general issue alone, a defendant has always been understood to waive the right to interpose afterwards a plea in abatement. The settled doctrine, however, is that the judge may permit a pleading to be withdrawn, and another one to be substituted, wherever by so doing he does not violate any positive rule of law, or of established practice. But such discretion will rarely, if ever, be exercised in aid of an attempt to rely upon a merely dilatory or formal defence." In that case the identical exception was made to the disqualification of a grand juror as in the case at bar, but the court, after making the observation quoted, could not see "from the record that this discretion had been improperly exercised" by the trial court, and, therefore, held that there was no error in overruling the prisoner's motion.

In *Curtis' Case*, 87 Va. 589, the same question was again under consideration by this court. There the prisoner upon his arraignment pleaded not guilty, upon which plea alone, as in the case at bar, the trial was had. The verdict was afterwards set aside, and a new trial awarded, and thereupon the prisoner undertook to contest the validity of the indictment on the ground that the grand jury had been improperly summoned. The court, however, citing 1 Bish. Crim. Proc., section 756, and reaffirming its ruling in *Early's Case*, *supra*, held that " it is well settled that objections to the mode of summoning a grand jury, or to the *qualifications* of particular jurors, must be made at a preliminary stage of the case—that is, before a plea to the merits; otherwise they will be considered as waived, unless the proceedings be void *ab initio*."

"After the general issue, or any plea in bar, it is too late to plead in abatement, except on leave to withdraw the former, be-

Opinion.

cause the plea in bar admits whatever is ground for abatement."
To the same effect is the ruling of this court in *Watson's Case*,
87 Va. 612.

In *United States* v. *Gale*, 109 U. S. 65, it was held that where
the objection is founded upon the irregularity in summoning the
panel, or upon the disqualification of particular grand jurors, it
must be taken before pleading in bar. Says the court in that case:
" It would be trifling with justice, and would render criminal
proceedings a farce, if the rule were otherwise."

The exception upon which this assignment of error is founded
is wholly formal, and taking fully into consideration the fact
urged by prisoner's counsel, that he was comparatively a stranger
among strangers when put upon trial for the offence of which he
has been twice convicted, it in no way appears that the County
Court in anywise abused its sound discretion in overruling his
motion to permit him to withdraw his plea of not guilty and
enter his plea in abatement.

Before entering upon a consideration of the remaining assign-
ments of error, it is needful to make a brief statement of this case.

The prisoner married the deceased in 1894, and they there-
after lived together unhappily in Pittsburg, Penn. In October,
1898, his wife came to Madison county, Va., upon a visit to her
parents, where she remained until the homicide. The prisoner
visited his wife in January, 1899, and upon this visit conducted
himself in a very objectionable manner. His wife then refused
to return to Pittsburg with him. On the 30th of March, 1899,
he left Pittsburg for another visit to his wife in Madison county.
He reached Culpeper on Saturday, April 1st, where he became
intoxicated, and was so offensive that he was unable to obtain a
conveyance to Madison until the afternoon of that day, and
reached the house of his wife's parents about night, where he
was received and given supper, but was refused permission to
spend the night. He spent the night at the home of a relative
of the family near by, and returned to his father-in-law's the

following morning in time for breakfast, and engaged in apparently friendly conversation with his wife before and after this meal. After breakfast, the prisoner, with his wife and child, took a walk into the woods, where they remained some two hours, and on return he ate dinner with his wife, and afterwards walked arm in arm to the fence with her and kissed her twice good-by as he was leaving with Peter Jackson, his father-in-law. He and Peter Jackson spent some portion of the afternoon of that day upon the mountain and returned before sunset, Peter Jackson much intoxicated, but prisoner not so much so. The prisoner then loaded his breech-loading gun, and with his little child, went into the woods to shoot a bird. He soon returned, went in to supper, placing his gun near his seat. After being seated a few moments, upon hearing his wife close the front door of the house, and coming as if to join them at the meal, he at once rose from the table, left the room, taking his gun in hand, remarking that he wished to have a word with his wife. He had gone only five or six steps out of the door when he was heard to ask his wife for the child, and she, in reply, asked him, " what he could do with it," when he shot her. Whereupon the father rushed from the table to the rescue of his daughter, but before reaching her there was a second shot, and the wife, bleeding, was seen to flee through the house in the direction of a neighbor's, some four hundred yards distant. The father endeavored to obtain the gun, and in the altercation the prisoner succeeded in loading it and fatally shot him, and at once continued the pursuit of his wife, overtaking her within about one hundred yards of her destination, where he threw her down and was apparently endeavoring to do her serious bodily harm. Two men came out of the house to which deceased was fleeing for safety and attempted to rescue her, but desisted at the point of the prisoner's gun and threats to kill them if they did not retire, which they did, followed in a moment or so by deceased, who had in some way extricated herself. She had not gone, however,

more than fifty yards, and was about to pass through the gate of said neighbor's house, when prisoner overtook her and fired at a distance of six or eight feet, the shot taking effect in the back of her neck, producing instantaneous death.

Pauline Jackson, a witness for the Commonwealth, while testifying on her examination in chief, began to tell of the killing of Peter Jackson, to which evidence the prisoner excepted, but the court overruled the exception, and this ruling constitutes the prisoner's third assignment of error. The killing of Peter Jackson was but a part of the tragedy in which the prisoner's wife lost her life, and for which he was on trial, and the witness relates these plain but connected facts, which form a vital link in the chain of evidence as to the general conduct of the prisoner, and are essentially parts of the *res gestæ*. We are of opinion, therefore, that the assignment of error is not well taken.

This witness was asked by the attorney for the Commonwealth "whether or not she saw her father dodge or fall after being shot," to which question counsel for the prisoner objected, and the attorney for the Commonwealth withdrew the question, to which the prisoner's counsel also objected on the ground that if any of the facts as to the killing of Peter Jackson went to the jury all should go, but the court permitted the question to be withdrawn, and this ruling constitutes prisoner's fourth assignment of error. The conduct of Peter Jackson when he was shot was purely irrelevant matter, and it cannot be conceived how the prisoner could have been prejudiced by this ruling of the court.

The fifth assignment of error relates to the admission of evidence to show that the prisoner was drunk at Culpeper on the day of his arrival, and continued in that condition to the evening of his arrival at the home of his wife. The prisoner had testified and had referred to letters he had written his wife, in which he claimed to have reformed his habits and declared his purpose to take his wife back with him to Pittsburg, or live happily with

her anywhere, if she would try him one more time. It was in rebuttal of the prisoner's evidence in these respects that the testimony as to his conduct at Culpeper, and his condition to the evening of his arrival at the home of his wife, was admitted. His whole conduct preceding the murder, as well as after, could be shown in order that the jury might be in full possession of all the facts incident to the preparation for and consummation of the crime, and we are of opinion that the court did not err in admitting this evidence.

The sixth assignment of error was not argued here, and is without merit.

The seventh error assigned is to the action of the court in permitting Lula Jackson and Genera Jackson, witnesses for the Commonwealth, to testify as to the relations that existed between the accused and the deceased. The principal objection urged to the admissibility of this evidence is, that it comes after the evidence of the prisoner had been closed, and not in rebuttal of any evidence which he had introduced. It has over and over been held by this court that the order in which testimony is admitted lies in the sound discretion of the trial judge, and his ruling in this respect will not be reversed unless it is manifest that that discretion has been abused. *Burk* v. *Shaver,* 92 Va. 352, and authorities cited. We see nothing in this assignment of error to warrant us in holding that the County Court abused its discretion in admitting this testimony after the prisoner had introduced his evidence; nor can we see that he was prejudiced by its introduction.

The eighth assignment of error relates to the refusal of the court to give Instruction No. 6 offered by the prisoner, and the giving of Instruction No. 4 asked for by the Commonwealth.

The theory of prisoner's defence is that he was crushed by his wife telling him on the walk in the woods in the morning that she was pregnant by another man, and, being intoxicated, he was suddenly excited by having his child snatched from him as he

was taking it away, and being struck in the back; that, as a consequence, he became enraged, lost all self-control, and without thought or reflection, fired the shot.

Of the seventeen instructions to the jury asked for by the prisoner, all were given except his sixth, which is as follows:

" The court instructs the jury that if they believe from the evidence that the prisoner committed the homicide charged in the indictment in the heat of passion, excited by a reasonable provocation which caused him to do the act without premeditation, and yet which was insufficient to deprive him of the power of self-control, in that case he is guilty of murder in the second degree, but if the provocation which he received was such as to reasonably deprive him of the power of self-control at the time the homicide was committed, then they should find him not guilty of murder, but of manslaughter."

In lieu of this instruction, Instruction No. 4 offered by the Commonwealth was given. It is in these words:

" That to sustain provocation as a defence to murder in the first degree, it must be shown that the prisoner at the time of the fatal shot, was deprived of the power of self-control by the provocation which he had received, and in deciding the question whether this was or was not the case, regard must be had to the character of the provocation, the nature of the act by which death was caused, to the time which elapsed between the provocation and the act which caused death, to the offender's conduct during the interval, and all the circumstances tending to show the state of his mind at the time he committed the act."

It is contended that in the refusal to give prisoner's Instruction No. 6, and in giving the Commonwealth's Instruction No. 4 in lieu thereof, the jury were precluded from finding the prisoner guilty of murder in the second degree.

Instruction No. 1 offered by the Commonwealth defines murder in the first degree as any wilful, deliberate and premeditated killing. By Instruction No. 2 the jury were further told what constitutes a wilful and premeditated killing. By Instruction No. 3 the jury were further told that a mortal wound given with a deadly weapon in the previous possession of the slayer without any or upon slight provocation, is *prima facie* a wilful, deliberate and premeditated killing, and throws upon the accused the necessity of proving extenuating circumstances. To these instructions the prisoner makes no objection, and immediately following these instructions is the Instruction No. 4 in question, by which the court instructs the jury that to sustain provocation as a defence to murder in the first degree, it must be shown that the prisoner at the time of the fatal shot was deprived of the power of self-control by the provocation received.

In view of the fact that there is no evidence in the record even tending to show any sort of provocation for the pursuit of the deceased, and the firing of the final and fatal shot, the instruction complained of could not possibly have been construed by the jury as telling them that, unless the provocation the prisoner claimed to have received was such as to naturally and reasonably deprive him of his power of self-control, they must find him guilty of murder in the first degree. They could not have understood the instruction, read in connection with the other instructions given, as telling them more or less than that if they believed from the evidence that the killing was wilful, deliberate and premeditated, it was murder in the first degree, and in deciding whether or not the prisoner was deprived of the power of self-control by the provocation which he had received, regard must be had to the character of the provocation, the nature of the act by which death was caused, to the time which elapsed between the provocation and the act which caused death, to the offender's conduct during the interval and all the circumstances

tending to show the state of his mind at the time he committed the act. There is, therefore, nothing whatever in the instruction, especially when considered in the connection in which it is given, that could have misled the jury into the conclusion that they could only find the prisoner guilty of manslaughter or murder in the first degree, and could not find him guilty of murder in the second degree.

All homicides are presumed in law to be murder in the second degree, and in order to elevate the offence to murder in the first degree, the burden of proof is on the Commonwealth; and, to reduce the offence to manslaughter, the burden is on the prisoner. *Wills' Case*, 32 Gratt. 929.

It is not claimed that the prisoner's guilt is less than that of murder in the second degree, but that his Instruction No. 6 should have been given in order that the jury might have not only considered the evidence as to provocation, but weighed and considered the degree of provocation.

Self-control determines malice, and as long as self-control exists the crime is murder in the first or second degree, to be determined by other facts than the varying degrees of the provocation. It is true that prisoner's Instruction No. 6 is taken from the instructions approved by this court in *Hodges' Case* (89 Va. 265), but the evidence in that case was very different from the evidence in this. In *Hodges' Case* there was evidence tending to show that the prisoner committed the homicide charged in the indictment in the heat of passion, excited by a reasonable provocation which caused her to do the act without premeditation. In this case, the evidence totally fails to disclose any provocation whatever for prisoner's pursuit of his wife and firing at her the final and fatal shot.

Whether or not this murder was in the first or second degree was to be determined by the principles of law fully applied by other instructions given in the case, and the jury could only have

been confused or misled about the varying degrees of self-control by the prisoner's Instruction No. 6. The sixteen instructions given for the prisoner cover every phase of the defence relied on by him, and are as favorable to him as the most favorable view of the evidence given on the trial by himself and his witnesses would justify. As was said by Riely, J., in *Gray's Case*, 92 Va. 772: "All of the instructions are in fact the instructions of the court, whether given at the instance of the Commonwealth or of the prisoner, and are to be read together."

When so read and considered, the instructions in the case at bar set forth the law of the case upon the whole evidence correctly and fairly.

It is proper, however, that we should consider the exception to the sixth instruction given at the instance of the Commonwealth. It is as follows:

" That if the jury believe from the evidence, beyond a reasonable doubt, that the prisoner gave the deceased the wound from which she died, as charged in the indictment, and that though he was at the time of committing the act, so intoxicated as rendered him incapable of forming a wilful, deliberate and premeditated purpose, yet if they believe from the evidence, beyond a reasonable doubt, that the prisoner, before becoming intoxicated, or while he was, though drinking, still in a condition in which he was capable of forming a wilful, deliberate and premeditated purpose, had formed a wilful, deliberate and premeditated purpose to kill the deceased, and that he afterwards, in pursuance of that purpose, so formed, gave the deceased the wound from which she died as charged in the indictment, then they are instructed that such an act upon the part of the prisoner, though he may have been intoxicated at the time of committing it, constituted in the eye of the law, a wilful, deliberate and premeditated killing, and as such is murder in the first degree."

It is conceded that the instruction announces a correct legal proposition, but it is claimed that it has no application to the case, inasmuch as there is no evidence tending to show that the prisoner became intoxicated for the purpose of committing the homicide which he had previously designed to commit.

This court says in the opinion in *Hodges' Case, supra,* and it has been often repeated, that the court cannot be required to instruct juries on mere general, abstract principles of law, however correct, unless these principles are applicable to the case. And it is settled law that a judgment of the trial court will not be reversed for the refusal to give an instruction, though announcing a correct principle, where there are no facts in the case to which it applies; but, conceding that there is no evidence in this case, tending to show that the prisoner became intoxicated for the purpose of committing the homicide which he had previously designed to commit, the question still to be determined is, does the giving of the instruction constitute error for which the judgment of the court on the verdict should be reversed? We are of opinion that the question must be answered in the negative. The giving of an instruction stating an abstract principle of law in a criminal case is not an error, unless the principle stated is erroneous. Sackett on Insts. to Juries, p. 17. In *Upstone* v. *The People,* 109 Ill. 169, where this precise question arose, it was held that the giving of an instruction stating an abstract principle of law, not applicable to the case, would not be error unless the principle stated was erroneous.

Doubtless if it could be seen in any case, that such an instruction did confuse or mislead or might have confused or misled the jury, the giving of the instruction would be ground for reversal of the judgment of the trial court, but where this does not appear, as in the case before us, we do not think that the judgment of the lower court should be reversed for the giving of such an instruction.

Marvin Pattie, one of the deputy sheriffs who, along with the other deputies in whose charge the jury had been placed during the trial, was called as a witness for the Commonwealth, and testified as to statements voluntarily made to him by the prisoner the evening of and after the homicide, but before witness became deputy sheriff, and on this ground the prisoner after the verdict moved for a new trial, which motion was overruled, and this ruling of the court is made the ground of the prisoner's tenth assignment of error. We are of opinion that there is no merit in the assignment. It is an old and frequent practice, it may be said, for sheriffs and their deputies, who have charge of juries under like circumstances, to testify in cases, but we have no case in the State which sustains the incompatibility here contended for. In the Supreme Court of Michigan this question was twice passed on, and it was held that a conviction will not be reversed because the officer who attended the jury was a witness for the people. *People* v. *Coughlin*, 65 Mich. 704; *People* v. *Beverly*, 108 Mich. 509.

In *State* v. *Shores*, 31 West Va. 499, the court says: " The mere fact of the sheriff having the jury in his custody could not disqualify him from being a witness, neither could the fact that he was a witness disqualify him to keep the jury in his custody."

The next error assigned relates to the refusal of the prisoner's motion for a new trial, made on the ground that, upon the jury being adjourned from day to day and placed in the custody of the sheriff, the record fails to show that he was instructed not to speak to them himself, nor to allow any one else to speak to them touching the trial. In the prisoner's bills of exceptions Nos. 4 and 5, the court certifies that, at the beginning of the trial, all the officers in charge of the jury were duly sworn, with the usual oath, to keep the jury during the trial, when in the absence of the court. It is not contended in the argument here that the jury were not in the custody of the proper officer of the court at

Opinion.

any time during the trial, but it is urged that when the record shows that the jury were adjourned from one day to another, it ought also to show that, upon such adjournment, they were committed to the custody of the proper officer of the court, *to whom the usual oath was administered.* The case of *Polky Barnes,* 92 Va. 794, is cited as supporting the objection made to the record in this case, but we are unable to see that the objection is within the scope of the ruling in that case. The conviction was reversed in that case because the record failed to show affirmatively that, upon the adjournment of the court from day to day, the jury were placed in custody of the proper officer of the court. Here the point of objection to the record is, that it does not show that the usual oath was administered to the officers in charge of the jury on each occasion during the trial when the jury were out of the presence of the court.

In *Bennett* v. *Commonwealth,* 8 Leigh, 745, it was held that the sheriff is bound *ex officio* to keep the jury when adjourned in a criminal cause, and it is not indispensably necessary that he be sworn, though it is generally done out of abundant caution. But, if it were admitted to be necessary, the court would be bound to presume that in fact the sheriff was sworn when the record does not show the contrary.

Where the record shows, as it does in this case, that at the beginning of the trial all the officers in charge of the jury were duly sworn, with the usual oath, to keep the jury during the trial, when in the absence of the court, it is to all intents and purposes a compliance with the "salutary and wise rule of practice" recognized and approved in the *Polky Barnes' Case, supra.*

The remaining assignment of error is to the refusal of the court to grant the prisoner a new trial, upon the ground that the verdict was contrary to the law and the evidence.

It is needless to say more of the evidence in detail than is to be found in the statement of the case already made. This was a

Opinion.

fiendish murder, perhaps not surpassed in atrocity by any to be found in the annals of the Commonwealth. The defence the prisoner attempted to set up is conclusively shown to have been groundless; in fact, it is wholly contradicted by his own confessions. His conduct when the horrible deed was committed was that of a cool, self-contained man, and when asked the cause of his murderous act, simply replied that the woman was his wife. It is, therefore, plain that the jury could not have found, in accordance with the evidence, any other verdict than that of murder in the first degree.

The judgment of the County Court is affirmed.

*Affirmed.*