**Wytheville.**

|101　833|
|107　838|

Litton v. Commonwealth.

June 25, 1903..

1. Criminal Law—*Grand Juries—Selection and Qualifications—Acts July, 1902—Regular and Special Grand Juries.*—The statute relating to the selection and qualification of grand jurors having been changed in July, 1902, it was not error in the judge of a county court, in selecting grand jurors for the August term, to quash a *venire facias* issued under the prior law, and to issue a new venire in conformity with the recent statute. Nor was it error to summon a regular instead of a special grand jury under the provisions of section 3978 of the Code.

2. Criminal Law—*Juries—Selection—Statements of Record—Inferences.*— The evidence in the record sufficiently shows that the original lists furnished by the judge of the trial court contained the names of the sixteen persons found free from exceptions by the court, and that the venire which tried the prisoner was taken from this panel. While these facts are not expressly stated in the record, it is a proper inference to be drawn from all that does appear in the record that all things were properly done in the summoning and selecting the jury, and that is sufficient.

3. Homicide—*Evidence—Motive—Preparation—Malice.*—Where a homicide by shooting has been clearly proved, it is entirely competent for the Commonwealth, in order to show intent, deliberation, preparation and malice on the part of the prisoner, to prove that, shortly after the shooting the prisoner had in his possession shells fitting the gun used, and which had been loaded previously to the homicide with shot similar to those which entered the body of the deceased.

4. Criminal Law—*Verdict—Illegal Evidence—Harmless Error.*—Generally, a judgment in a criminal case will be reversed where illegal or improper evidence has been allowed to go to the jury, but this rule is inapplicable where the evidence complained of was admissible, and the trial court instructed the jury to disregard it if they

Statement.

had reasonable doubt as to its applicability, and the verdict clearly shows that no weight was given to it by the jury.

5. CRIMINAL LAW—*Accused as Witness—Cross-Examination—Motive.*—A prisoner, when examined in his own behalf, may be asked, on cross-examination, as to his own motives and intentions, when these are material. This is especially so when he neither claims his exemption nor suggests that his answer would tend to criminate him.

6. CRIMINAL LAW—*Evidence—Order of Introduction—Rebuttal.*—The Commonwealth is not bound, in the first instance, to introduce evidence touching an affray which happened several hours before, and which led up to the homicide under investigation, but may rest its case when the homicide has been proved, and if the prisoner introduces evidence of the affray to extenuate his act, the Commonwealth may then, by way of rebuttal, introduce evidence to show its version of that occurrence.

7. CRIMINAL LAW—*View by Jury—Code, Section 3167.*—Section 3167 of the Code, relating to views by a jury, applies to criminal as well as civil cases, and under its provisions the court may, at the instance of the Commonwealth and against the objection of a prisoner, direct a view by the jury of the scene of a homicide, for the purpose of enabling the jury better to understand and apply the evidence in the case. For a history of the statute and its collocation, see opinion of *Cardwell, J.*

8. CRIMINAL LAW—*Homicide—Presumed Murder of Second Degree—Burden of Proof.*—There is no error in an instruction, on a prosecution for murder, which tells the jury that if they believe that the prisoner shot and killed deceased they should presume him guilty of murder of the second degree, and that the burden is on him to reduce the offence to manslaughter, or to show self-defence, and on the Commonwealth to elevate the offence to murder of the first degree.

9. INSTRUCTIONS—*Fully Instructed.*—When all of the instructions given in a case for both sides, read as a whole, set forth the case correctly and fairly it is not error to refuse other instructions.

Error to a judgment of the County Court of Washington county, rendered December 10, 1902, sentencing plaintiff in error to confinement in the penitentiary for five years on indictment for murder.

*Affirmed.*

The facts in the case sufficiently appear in the opinion of the

court, but a portion of the evidence is here inserted in order to show the contention of prisoner's counsel. After the shooting had been proved, and it had been shown that the deceased was struck by upwards of one hundred shot, the physicians who conducted the *post mortem* examination were examined as to the size of the shot taken from the body, and as to the holes in the body. They testified that all of the shot taken from the body were No. 3 or No. 4 shot, and one of the physicians also testified that there were holes in the body apparently made by shot of a larger size, and that he did not think that the holes could have been made by two or three shot entering together. The Commonwealth then introduced evidence to show that on the night following the homicide the prisoner's gun was found in the hall of his house with two loaded shells in it, in one of which the wad was sewed in. These shells were produced at the trial, and testimony offered as to finding them in the prisoner's gun. The witness who introduced the shells was then asked to open them in the presence of the jury, and disclose their contents to the jury. This was done and each shell was found to contain ten buckshot, and from twenty-one to twenty-five small shot, which were exhibited to the jury. All of this evidence was received over the objection of the prisoner. After the argument had begun and several speeches had been made on each side, the court, of its own motion, instructed the jury that if they had a reasonable doubt as to the connection of the accused with the two shells produced in the evidence by the Commonwealth and claimed to have been taken from the gun of the accused on the night after the shooting they should disregard said two shells and evidence directly connected with them from their consideration. Counsel for prisoner insisted that the Commonwealth, by the results of the *post mortem* examination, had determined the size of the shot which entered the body of the deceased; that the doctor had been especially instructed to ascertain the size of the shot, and that he found

no shot except No. 3, and that it was not competent for the
Commonwealth to disregard this positive testimony as to the
size of the shot and undertake to prove the size by problematic
evidence; and, furthermore, that other testimony of the Com-
monwealth confirmed the result of the *post mortem* as to the
size of the shot which entered the body, and proved that the
shells which were in the gun when fired at deceased were not
loaded as were the shells found in the gun after the homicide;
that if they had been so loaded and every shot had struck the
deceased more holes were found on his body than there were
shots in the two shells. It was further insisted that the giving
of the instruction to the jury was an admission on the part of
the trial court that it had committed an error in admitting the
evidence, but that the error could not be thus cured, as the bad
effect of the evidence could not be thus removed by an instruc-
tion. The instruction was also asssailed on the ground that it
submitted to the jury the determination of a legal question,
to-wit: The admissibility of evidence, which should have been
determined by the court.

It appears from the evidence that the deceased and the
prisoner had had a difficulty in the afternoon several hours
before the homicide, in which the prisoner had been severely
beaten by the deceased. This difficulty in the afternoon led
up to the subsequent homicide. The Commonwealth, to main-
tain the issue on its part, confined its evidence in chief to the
time of the actual homicide. The prisoner, in his defence,
offered evidence as to the previous difficulty, and thereafter
the Commonwealth offered in rebuttal evidence to show its
view of the difficulty in the afternoon. It was insisted for the
prisoner that while as a general rule the trial court has great
discretion in the order of introducing testimony, yet that "the
cardinal rule that the Commonwealth shall first introduce her
evidence in chief, and the defence shall next introduce its
evidence in chief, with the right to each party thereafter to

prove matters strictly in rebuttal, has been so violated as to present an error in this case which requires a reversal of the rulings of the trial court." It was argued that the action of the court complained of was "subversive of the established rules governing the introduction of testimony in criminal cases, and tended greatly to the prejudice of the prisoner in leaving him to confront a case of murder without any palliation, and arising from facts actually constituting a part of the *res gestœ*."

*Honaker & Hutton, White & Penn, Daniel Trigg* and *Walter H. Robertson,* for the plaintiff in error.

*Attorney-General William A. Anderson* and *J. C. Wysor,* for the Commonwealth.

CARDWELL, J., delivered the opinion of the court.

This is a writ of error to a judgment of the County Court of Washington county, sentencing Moses W. Litton to confinement in the penitentiary for a term of five years for the killing of John Collings.

It appears that there was bad feeling between the prisoner and the Collings family, caused by the alleged depredation of the fowls of Collings on the lands of the prisoner; that the lands of the prisoner were near those of J. K. Collings, father of the deceased, being separated by a lane which ran near the barn of J. K. Collings; that on the 18th day of July, 1902, John Collings, the deceased, had been hauling hay, and had come to his father's barn, and, accompanied by his mother and sister (the latter carrying a Winchester rifle), went out to the adjoining meadow of the prisoner, where he was at work, to get a chicken which the prisoner had injured or killed; and that there the deceased and the prisoner had a difficulty, in

which the deceased felled the prisoner to the ground by a severe blow upon his right cheek with a fork handle which he had brought with him, and then returned to his own home, near by. The Commonwealth's evidence is to the effect that the prisoner was facing the deceased, with a stick in his hand, acting as though he intended to use it, when the deceased struck him on the side of his face, mashing his cheekbone and felling him to the ground, while the evidence of the prisoner is to the effect that he was in a stooping position, picking up weeds, with his back to the deceased, when he received the blow.

This difficulty occurred between 3 and 4 o'clock in the evening of July 18, 1902. About 7 o'clock the same evening, after his wound had been dressed, the prisoner came out upon his front porch, taking a seat, with his double-barrelled shotgun beside him, and upon hearing a wagon approaching along the public road in front of his house, and supposing the deceased was on the wagon, the prisoner took a position in the corner of his yard, near the yard fence running parallel with the public road, and next to the approaching wagon, with his gun in his hand, and when the deceased, upon a load of hay, and driving the team, with the lines in the left hand, and a whip in the right, was about opposite him, the prisoner raised his gun and fired, the load taking effect in the elbow of deceased's left arm, whereupon the deceased undertook to shoot at the prisoner with a pistol he had been carrying in his pocket or on the wagon; the discharge of the pistol and the second shot from prisoner's gun being simultaneous; the second shot from the gun taking effect in deceased's left side, over the heart. After the deceased was thus shot he continuel to fire his pistol until its five chambers were emptied, but, as he was in a dying condition, the shots went wild of the prisoner. The prisoner then ran back to his house, about forty-five yards away, got his Winchester rifle, came out again to the yard, and warned Smith, who was on the wagon, holding the deceased, to get out

of the way; but, upon being told by Smith not to shoot—"You have already killed him"—the prisoner did not fire his rifle, and went back into his house. The deceased had then expired.

The first error assigned relates to the impaneling of the grand jury which found the indictment against the prisoner. Prior to the August term, 1902, of the County Court, at which the prisoner was indicted, the judge of the court had, in accordance with the statute, furnished the clerk with a list of forty-eight persons to serve as grand jurors for a year, and the clerk had issued a *venire facias* for twelve of the persons on that list to serve at the August term, 1902; but in the meantime the General Assembly passed the act of July 28, 1902, amending section 3976 of the Code, prescribing who are qualified persons to serve as grand jurors, how they are to be selected, etc. (Acts 1902-'3, p. 22.) The judge of the County Court, deeming it expedient to do so, on the first day of the August term, 1902, quashed the writ of *venire facias* for the grand jurors to serve at that term, and furnished the clerk with another list of forty-eight persons to serve as grand jurors for one year, beginning with and including that term, in accordance with the act of July 28, 1902; and from that list the clerk, as ordered by the judge, issued a writ of *venire facias* for twelve of said jurors to attend the day the writ was issued, to serve as grand jurors at the August term of the court, then begun. Thereupon all of the twelve grand jurors so summoned appeared in court, were duly sworn and examined according to law, and eleven of them were found to be free from exception, who were sworn a jury of inquest according to law, and thereafter, on the following day, presented the indictment upon which the prisoner was tried and convicted.

The contention made for the prisoner is that the court erred (1) in quashing the *venire facias* issued by the clerk on the 13th of August, 1902; and (2) in not impaneling a special

grand jury, under the provisions of section 3978 of the Code,
which are as follows: "A special grand jury may be ordered
at any time by a county, corporation, or hustings court, or the
judge thereof in vacation, the jurors to be summoned from a
list furnished by the judge; and where a grand jury, regular
or special, has been discharged, the court, during the same
term, may impanel another grand jury, which may be a special
grand jury."

Section 3977 of the Code, as amended by the Act of Feb-
ruary 25, 1890 (Acts 1889-'90, p. 91, c. 115), provides that a
regular grand jury shall consist of not less than nine nor more
than twelve persons, and a special grand jury of not less than
six nor more than nine persons; and clearly it was within the
discretion of the judge of the County Court of Washington
county at its August term, 1902, to impanel a regular or a
special grand jury to serve at that term. Having impaneled a
regular grand jury, consisting of not less than nine nor more
than twelve persons, to-wit, eleven, selected from a list of forty-
eight persons to serve as grand jurors for one year, beginning
with that term, there is nothing whatever in the proceedings
to vitiate the indictment found against the prisoner. *Shinn's
Case*, 32 Gratt. 907.

It appears that several lists and writs of *venire facias* were
issued before a panel of sixteen persons, free from exception,
was obtained, from which the jury that tried the prisoner was
selected. To each of the writs of *venire facias* the prisoner ex-
cepted, without assigning any grounds therefor, the exceptions
were overruled, and this is assigned as error.

Several grounds are stated in the argument here, upon which
we are asked to hold that the County Court erred in summon-
ing and selecting jurors who tried the prisoner, among which,
and the only ones that we deem it necessary to consider, are
(1) that the record does not affirmatively show that the original

list furnished by the judge contained the names of sixteen persons; and (2) that the jurors making up the panel from which the jury that tried the prisoner were selected were the jurors who, upon their examination by the court, were found free from exception.

The bill of exceptions upon which the assignment of error is founded sets out at length all the proceedings in the summoning, selecting, and impaneling the jury, setting forth that after the prisoner was led to the bar of the court, and issue joined upon his plea of not guilty, the sheriff returned the list furnished by the judge of the court, and the *venire facias* issued by the clerk thereof, which showed that all the persons named therein had been summoned; that they were solemnly called, and fourteen of them (names given) appeared in open court; that other lists were furnished by the judge, and writs of *venire facias* issued by order of the court thereon, directing that the persons named be summoned, which was done, and the two persons so summoned appeared in open court, making, with the fourteen already in court, sixteen; that thereupon, the jurors so selected and summoned all appeared in open court (naming them), who were duly sworn and examined according to law, and eight were found to be free from exception; that another list was furnished by the judge, and a *venire facias*, No. 4, was ordered by him, and issued, as provided by law, to complete the panel of said *venire*, returnable that day; that some time thereafter the sheriff made return of same, which showed said persons had been summoned (naming them), and they appeared in open court, and were duly sworn and examined, and but three of them found free from exception; and that similar proceedings were taken until a sufficient number of persons free from exception was obtained to complete the panel, and from this panel the prisoner, by counsel, struck four, and the remaining twelve were selected to constitute the jury for his trial (naming the twelve).

In the first place, it is to be observed that the record shows that the judge furnished the list required by law; that the *venire facias* was issued by the court; that the sheriff's return showed that all the persons named on the list and writ had been summoned, and they were called, but fourteen answered. It is unreasonable to suppose that if the fourteen persons, who answered, and whose names were on the list furnished by the judge, were the only names on it, language would have been used, as is done in the bill of exceptions, showing clearly that more than fourteen persons were on the list and summoned. We think that it clearly appears that the lists were furnished by the judge, and that the writs of *venire facias* were duly issued, all in accordance with the requirements of the statute relative to summoning and selecting juries in felony cases. In other words, we are of opinion that it is a proper inference to be drawn from all that does appear in the record that all things have been properly done in the summoning and selecting of the jury in this case (*Gilligan's Case*, 99 Va. 816, 37 S. E. 962), and we find nothing in the *Barnes' Case*, 92 Va. 794, 23 S. E. 784, cited by prisoner's counsel, opposed to this view.

What we have just said applies with equal force to the contention that the record fails to show that the jurors composing the panel of sixteen persons from which the jurors who tried the prisoner were selected were the jurors who, upon their examination by the court, were found to be free from exception, and will only add that the record plainly shows that the jurors selected were all on one or the other of the lists furnished by the judge, and the writs of *venire facias* issued upon them, and that sixteen of them were found to be free from exception. Therefore, to sustain the contention of counsel, we would have to presume that the court allowed to be put upon the jury the jurors not found to be free from exception, in the face of the fact that a sufficient number had been found to be free from exception and were in court. Such an error cannot be presumed. *Gilligan's Case, supra; Dove's Case*, 82 Va. 306.

The court is further of opinion that the County Court did not err in admitting the testimony of George Rodgers and P. J. Davenport in regard to certain shells found in a gun at the house of the prisoner several hours after the homicide. The homicide had been clearly proven, and there was direct evidence on the part of the Commonwealth as to the character of the shot found in the body of the deceased; and it was entirely proper for the Commonwealth to show intent, deliberation, preparation, and malice on the part of the prisoner, by proof that he had in his possession shells fitting the gun he used, and which had been loaded previously to the homicide with similar shot to those which entered the body of the deceased. Moreover, the court, after a part of the argument of counsel had been heard, instructed the jury that, if they had any doubt as to the connection of the prisoner with the two shells produced in evidence by the Commonwealth, they should discard the two shells and the evidence directly connected with them from their consideration; and the verdict of the jury, finding the prisoner guilty of voluntary manslaughter, showing, as we think, conclusively, that this evidence in no way affected the jury in their deliberations, it is impossible, even if it were conceded that it was inadmissible, that this evidence could have had any effect prejudicial to the prisoner. It was clearly admissible, as we have said, to show deliberation, preparation, and malice; and the court having, in clear and unmistakable terms, instructed the jury to disregard it if they had reasonable doubt that the prisoner was connected with the two shells produced, there was no ground left upon which he could complain of its introduction.

While it is a general rule that the judgment must be reversed where illegal or improper evidence has been allowed to go to the jury, the rule is wholly inapplicable to a case like this, where the evidence complained of was admissible; where the court, out of abundant caution, gave the instruction above

mentioned; and where the verdict clearly shows that no weight was given by the jury to the evidence objected to. *Porterfield's Case*, 91 Va. 803, 22 S. E. 352.

The court is further of opinion that the County Court did not err in allowing the question: "What were you going to do? Were you going to shoot John, whether you saw the pistol or not?"—to be asked the prisoner on his cross-examination.

"A party, when examined as a witness, may be asked as to his own motives and intention, when these are material. *Jackson's Case*, 96 Va. 111, 30 S. E. 452; Thompson on Trials, sec. 642, and note on page 525.

In this case the prisoner, when asked the question above mentioned, neither claimed his exemption, nor suggested that his answer to the question would criminate or tend to criminate him. On the contrary, he answered voluntarily, and his answer was in fact in his own favor, and certainly not to his prejudice.

The court is further of opinion that the court did not err in admitting in rebuttal the evidence introduced on behalf of the Commonwealth as to the occurrence in the meadow several hours before the homicide. The Commonwealth not only has the right to conduct its case as its representative may see fit within reasonable limits, but to rest its case when the homicide is proven. Then the burden is on the prisoner to extenuate, justify, or excuse his act; and, in this case the prisoner having put in evidence as to the occurrence in the meadow, it was entirely regular and permissible for the Commonwealth to introduce, in rebuttal or reply, evidence to show its version of that occurrence. Therefore, there was no error in permitting this to be done.

After all the evidence had been introduced, but before the case had been submitted to the jury, and before the instructions were given by the court, the attorney for the Commonwealth moved the court for a view on the part of the jury of the grounds where the homicide was committed—stating that he

deemed it necessary for a proper understanding of the cause—to which motion the prisoner objected, the objection was overruled, and the jury ordered to be taken to the grounds by the officers of the court; and this ruling of the court is assigned as error.

It is not suggested that every safeguard was not thrown around this proceeding, or that the jury was not in proper legal custody, or that evidence was taken on the view, or that the conduct of the jury was not free from exception; nor does it appear that the prisoner and his counsel were not present, or were denied that right. Therefore, the only contention made in this connection is that it was error to order the view over the objection of the prisoner.

There is conflict of authority whether the court may, at common law, in its discretion, permit the jury to visit and view the premises where it is alleged a crime was committed, not for the purpose of furnishing evidence upon which a verdict is to be founded, but for the purpose of enabling the jury better to understand and apply the evidence which is given in court. 9 Amer. & Eng. Enc. L. 725; 22 Enc. Pl. & Pr. 1038, and authorities cited. But in our opinion, the matter is controlled in this State by statute.

Section 3167 of the Code is: "The jury may in any case, at the request of either party, be taken to view the premises or place in question, or any property, matter or thing, relating to the controversy between the parties, when it shall appear to the court that such a view is necessary to a just decision. . . ."

In order to give to this statute a correct interpretation, we deem it necessary to trace its history. It was doubtless taken from 6 Geo. IV., c. 50, sec. 23.

In 2 Tidd's Pr. 796 (Amer. Notes), it is said: "In a criminal case, there could formerly have been no view, without consent. But now, by St. 6 Geo. IV., c. 50, 'where in any case,

either civil or criminal, or on any penal statute, depending in any of the courts at Westminister, or in the counties palatine, or great sessions in Wales, it shall appear to any of the respective courts, or to any judge thereof in vacation, that it will be proper and necessary that some of the jurors who are to try the issues in such case should have the view of the place in question, in order to their better understanding the evidence that may be given upon the trial of such issues, in every such case, such court, or any judge thereof in vacation, may order a rule to be drawn up, containing the usual terms, and also requiring, if such court or judge so think fit, the party applying for the view to deposit in the hands of the undersheriff a sum of money to be named in the rule for the payment of the expenses of the view,' " etc.

This statute was enacted the sixth year of the reign of George IV., and it was at that time an open question in this country whether a view could be allowed in a criminal case in the absence of a statute authorizing it; some of the courts holding that it could not, and others taking the opposite view.

In Robinson's Practice (Old Ed.), pp. 178, 179, the subject is briefly discussed, and some of the decided cases are given, in which the view was denied and allowed, but the author expresses no opinion on the subject.

When our statutes were codified in 1849 there was ingrafted, as section 10 of Chapter 162, Code 1849, under the heading of "Juries Generally," the following: "Sec. 10. The jury may, in any case, at the request of either party, be taken to view the premises or place in question, or any property, matter or thing relating to the controversy between the parties, when it shall appear to the court that such view is necessary to a just decision: provided the party making the motion shall advance a sum sufficient to defray the expenses of the jury, and the officers who attend them in taking the view; which expenses shall be afterwards taxed like other legal costs."

It will be readily observed that this statute is substantially the same as the act of Geo. IV., *supra*, the principal difference being in the omission of the words "either civil or criminal." It will be observed, also, that when this statute was enacted it became section 10 of the chapter entitled "Juries Generally," and that other sections of the chapter apply, beyond dispute, to criminal cases, so that the argument to be deduced from its collocation is wholly in favor of its operation in criminal as well as civil cases. In the compilation of our statutes into what is called the "Code of 1860," the statute just quoted appears under the same heading and in identically the same words as section 39, c. 162. It so appears in the compilation known as the "Code of 1873," as section 37, c. 158; and, when the revision of our statutes was made in 1887, no change whatever was made in the statute, except to place it under the head of "Juries in Civil Cases," instead of under the former heading. While the collocation or classification of a statute in the Code is to be considered in determining the legislative intent in its enactment, it is not sufficient of itself to warrant the conclusion that the placing of a statute under the head of "Juries in Civil Cases," theretofore applicable to both civil and criminal cases, repeals it as to the latter, and confines its operation to the former. Nor do we attach any importance to the omission of the words "either civil or criminal" when the statute of 6 Geo. IV., *supra*, was ingrafted into the Code of 1849. When the statute says "in any case," it includes the only two classes of cases we have, viz., civil and criminal; and doubtlesss it was in the legislative mind that, having used the words "in any case," the words "either civil or criminal" would be mere surplusage.

If the words "in any case" are to be construed as not applying both to civil and criminal cases, which class is to be excluded? Would it not be as grave an invasion of the province of the Legislature to say, by judicial interpretation, civil cases only were in the contemplation of the framers of the statute,

as it would be to hold that criminal cases only were within its purview? Is it not safer to do no violence to the language employed, to give to the words used their natural meaning and effect, and to hold that the phrase "any case" covers all cases to be tried by a jury? There is nothing in the phraseology of the statute that confines its operation either to civil or criminal cases, but both are included, and a view may, in the discretion of the presiding judge, be ordered in either case, whether there be objection on the part of either party or not; and it is a matter of common knowledge that it has been the practice in this State for a great while to permit the jury to view the premises or locality where the crime is alleged to have been committed, though we cannot recall that such has been the practice in cases in which the accused objected.

We are also of opinion that the mere preservation of the provision contained in the original English statute from which our statute (now section 3167 of the Code) was taken, relative to the costs of a view, nor the fact that the Legislature, by Act of January 18, 1888 (Acts 1887-'88, p. 18, c. 15), amending section 4048 of the Code, declared that section 3167 "shall apply to jurors and juries in all cases, criminal as well as civil," justifies the conclusion that section 3167 was theretofore applicable to civil cases only. With reference to the first proposition, we deem it only necesssary to say that, in the enforcement of the provision in the statute touching costs, the courts are controlled by it and other statutes in force in this State, in *pari materia;* and, with reference to the second proposition, that, in our view, the amendment of section 4048 of the Code was wholly unnecessary to make section 3167 applicable to criminal cases.

Whether or not the Act of January 18, 1888, amending section 4048 of the Code, is repugnant to section 15 of Article V. of the Constitution of this State, we do not deem it necessary to express an opinion.

Instruction No. 1 given for the Commonwealth told the jury that, if they believe from the evidence that the prisoner shot and killed the deceased, then they should presume him guilty of murder in the second degree, and the burden of proof was upon him to reduce the offence to manslaughter or killing in self-defence, and the burden was upon the Commonwealth to elevate the offence to murder in the first degree. And after argument had been made, in part, for the Commonwealth and the prisoner, the court, *ex mero motu*, withdrew that instruction, and gave another in lieu thereof, as follows: "The court instructs the jury that when the Commonwealth has proven that the accused has committed a homicide, and it does not appear from the circumstances given in evidence by the Commonwealth that the killing was of a lower degree than murder in the second degree or in self-defence, then it is a *prima facie* murder in the second degree, and the burden is cast upon the accused to prove that it was below murder in the second degree or in self-defence; and, if the Commonwealth seeks to elevate the offence to murder in the first degree, the burden is upon it to do so. Yet when the evidence is all in, then, if the evidence both for the Commonwealth and the accused leave a reasonable doubt as to the guilt of the accused, the jury must find the prisoner not guilty.." This is also assigned as error. The court is wholly unable to see any merit in this assignment. Both instruction No. 1 and the instruction given in lieu of it propound a proposition of law over and over again sanctioned and approved by this court.

The court gave eight instructions asked for by the Commonwealth, thirteen out of fourteen asked for by the prisoner, and one of its own motion in lieu of instruction No. 1 given for the Commonwealth, and withdrawn after part of the argument had been heard, as stated.

The instruction No. 9 asked for by the prisoner, and refused, attempted at great length to set out the case in all of its phases,

but failed to do so; and, in some of the phases presented in it, the prisoner was certainly guilty of an offence proper to be punished, yet the instruction concluded with, "they (the jury) shall find the prisoner not guilty." Besides, every proposition of law contained in the instruction, proper to have been given in the case, had been covered by the instructions already given. Where the instructions given for the Commonwealth and the prisoner, read as a whole, set forth the whole case correctly and fairly, as was the case here, it is not error to refuse other instructions. *Reed's Case*, 98 Va. 827, 36 S. E. 399; *Willis' Case*, 32 Gratt. 929.

The remaining assignment of error is to the refusal of the court below to set aside the verdict and award the prisoner a new trial. Having made a full statement of the case as disclosed by the record, it is needless to review the evidence at length.

We know of no law that justifies the taking of human life in the manner and under the circumstances narrated in this record, even if the facts and circumstances surrounding the homicide be as the prisoner would have us to believe existed when he took the life of the deceased, John Collings.

Upon the whole case, we are of opinion that it is plainly one in which the verdict of the jury should not be disturbed. Therefore, the judgment complained of is affirmed.

BUCHANAN, J., dissenting.

I concur in the result, but not in the opinion of the court. I do not think that section 3167 of the Code of 1887 authorizes a view in criminal cases, as the court holds. The chapter in which it is found in the Code applies solely to juries in civil cases. By the Act approved March 18, 1884 (Acts 1883-'84, p. 702, c. 523), entitled "An act to revise and digest the Code and statutes of Virginia," it was made the duty of the revisers to collate and revise all the general statutes of the Common-

wealth. In performing that duty they were required, among other things, to "arrange all the statutes under appropriate titles and chapters."

Section 3167 of the Code is found under "Title 46," entitled "Courts and Juries in Civil Cases" (Code, p. 731), and in chapter 152, entitled "Of Juries in Civil Cases" (Code, p. 750). These titles are parts of the Code. This is so, it seems to me, both from the language of the act directing the manner in which the Code should be revised, as well as from the fact that the titles were in the Code when it was reported to and adopted by the Legislature. This view is sustained by Judge Burks, one of the revisers. In his address before the State Bar Association in 1891 (Bar Association Report for that year, p. 110), he says: "It should be observed that the title of contents of sections prefixed to each chapter, and the headings of the revised sections taken from the title, together with the notes and marginal references to adjudged cases, were the work of the revisers, done in course of the publication of the Code after it was adopted. It was authorized by a section of the act directing the publication. That section was taken literally (with change of names) from the act directing the publication of the Code of 1849. It is hardly necessary to say that these titles, headings of sections, notes, and marginal references, prepared after the Code was adopted, and published with it, though authorized as a matter of convenience, constitute no part of the law." His language clearly implies that the titles to the chapters were a part of the Code. Not only did the Legislature think that section 3167 of the Code did not apply to criminal cases, but that was the view of the revisers, also, for in the same address, at page 111, Judge Burks says: "Some errors of the revisers, the result of oversight while under great pressure, were discovered by them after the Code was adopted, and before it went into operation. These, at their instance, were corrected by the Legislature at the session of 1887-'88,

and the amendments will be found in the acts of that session."
The act referred to by Judge Burks was Chapter 15 of the
Acts of 1887-'88, pp. 15-18. By section 4048 of that chapter
it is provided that section 3167, together with eleven other sec-
tions of the Code (naming them), "shall apply to jurors and
juries in all cases, criminal as well as civil."

Providing that those sections should apply to criminal as
well as civil cases was not, in my opinion, amending them,
within the meaning of section 15 of Article V. of the Constitu-
tion. It was merely extending their operation to another class
of cases, without in any way amending or changing them. This
seems to have been the view of the revisers, since the act mak-
ing them applicable to criminal cases was passed at their in-
stance, and doubtless drawn or approved by them. They would
scarcely have drawn or approved an act intended to correct
their own mistakes, and asked the Legislature to pass it, unless
they were fully satisfied that it was not in conflict with the
Constitution of the State.

That act, and not the Code, in my judgment, authorized the
County Court to direct the view of which the prisoner com-
plains.

                                             *Affirmed.*