# Richmond.

## Sims v. Commonwealth.

### November 16, 1922.

1. CONTINUANCES—*To Allow Counsel Time for Preparation.*—While courts should afford those accused of crime a reasonable opportunity to employ counsel and prepare their cases for trial, the calling of the docket and the trial of cases cannot be made subservient to the convenience and engagements of counsel in other cases. .

2. CONTINUANCES—*To Allow Counsel Time for Preparation—Counsel Engaged in Other Cases—Case at Bar.*—In the instant case, a prosecution for homicide, the offense was committed October 6th, the indictment was found October 26th, and counsel were employed a few days before the term began. On October 26th the case was set for hearing on November 2nd. Counsel for accused moved for a continuance on the ground that they had had no opportunity to fully. investigate the case, as they had criminal cases set for every day, one after another. At the trial every eye witness of the killing was present and examined.

   *Held:* That the trial court did not abuse its discretion in refusing the continuance.

3. CONTINUANCES—*To Allow Counsel Time for Preparation—Discretion of Court.*—The matter of what time shall be allowed counsel for the accused to prepare the case rests in the sound discretion of the trial court, which will not be interfered with except in case of abuse.

4. CONTINUANCES—*Absence of Witness—Accused not Prejudiced by Absence—Case at Bar.*—In the instant case, a prosecution for homicide, accused asked for a continuance on the ground of the absence of a witness, who would have testified that deceased said to the witness that the first time he "got an excuse or a chance he was going to kill" the defendant. Accused went on the stand and testified in his own behalf, and never intimated that any threats had been communicated to him.

   *Held:* That the refusal of the court to continue the case because of the absence of this witness was harmless error, if error at all.

5. HOMICIDE—*Self-Defense—Threats.*—Threats by one to take the life of another will not justify the latter in taking the life of the former prior to any overt act towards carrying the threats into effect, and not even then until the killer has first done all in his power to avoid

the necessity of the killing, if he was at fault in bringing on the combat.

6. HOMICIDE—*Witnesses—Cross-Examination—Testimony Ordered Stricken Out on Direct-Examination Brought Out on Cross-Examination—Case at Bar.*—In the instant case, a prosecution for homicide, a witness in relating what occurred at the time of the shooting stated that he had said, "Here is a man lying here dead without any cause." Upon objection the court ruled out the statement. Upon persistent cross-examination and insinuation on the part of counsel for the accused that the witness was not present at the time of the shooting, witness repeated this statement and the court refused to instruct the jury to disregard it.

*Held:* That accused could not have been injured by this opinion of the witness and the refusal to strike it out was not reversible error.

7. WITNESSES—*Impeachment—Cross-Examination.*—A witness may be impeached by the character of his cross-examination.

8. WITNESSES—*Leading Questions—Questions Merely for Explanation.*—In a prosecution for homicide a witness testified that she had said that another witness for the Commonwealth "was not there when the shooting was done, but he was the first one come up." Thereupon the Commonwealth's attorney asked the witness, "Did you mean that he was there or that he was not there?" To which she replied that she did not see him until the shooting was done. Whereupon the Commonwealth's attorney said, "You do not undertake to tell the jury that he was not there, but that you did not see him there," to which witness replied, "No, sir."

*Held:* That the first question was not leading and the second one was merely explanatory of the preceding answer and emphasized the explanation, and that the prisoner could not have been injured thereby.

9. HOMICIDE—*Reduction of Homicide from Murder in the Second Degree to Manslaughter—Burden of Proof—Reasonable Doubt.*—In order to reduce a homicide from murder in the second degree to manslaughter or excusable homicide, the burden is upon the accused. But this merely means that it is incumbent upon the accused to introduce evidence sufficient to raise a reasonable doubt in the minds of the jury as to whether the offense is murder in the second degree.

10. CRIMINAL LAW—*Reasonable Doubt Arising from Commonwealth's Evidence.*—A prisoner is entitled to the benefit of a reasonable doubt arising from the evidence of the Commonwealth as well as from his own evidence.

11. HOMICIDE—*Reduction of Homicide from Murder in the Second Degree to Manslaughter—Reasonable Doubt—Burden of Proof.*—If a reasonable doubt arises from the evidence of the Commonwealth as to whether a homicide is murder in the second degree, there is nothing to be overcome by evidence for the accused, but unless it does so arise

47

Syllabus.

the presumption that the homicide is murder in the second degree continues until overcome by evidence on behalf of the prisoner which raises a reasonable doubt as to the guilt of the prisoner of the particular offense presumed.

12. INSTRUCTIONS—*Read as a Whole.*—Instructions ought to be read as a whole.

13. CRIMINAL LAW—*Evidence—Reasonable Doubt.*—The prisoner never has to prove any fact either beyond a reasonable doubt, or by a preponderance of the evidence. All he has to prove in any case is such a state of facts as will raise a reasonable doubt in the minds of the jury as to the existence of the fact or facts sought to be established by the Commonwealth.

14. HOMICIDE—*Instructions—Or Substituted for And.*—The trial court instructed the jury that "If the killing of a human being be malicious, but not willful, deliberate or premeditated, then such killing is murder in the second degree." By apparently a mere clerical error the word *or* is substituted for *and* before the word "premeditated."

  *Held:* That the jury could not have been misled to the prejudice of the accused by this error.

15. HOMICIDE—*Degrees of Homicide.*—Every *malicious* homicide is murder. If in addition, the killing be willful, deliberate *and* premeditated it is murder in the first degree. So are the cases specifically enumerated in the statute. All other murder is murder of the second degree. Code, section 4393.

16. HOMICIDE — *Instructions — Reasonable Doubt — Instructions Read Together.*—In a prosecution for homicide the court instructed the jury that "if they believe from the evidence" that the prisoner killed deceased on a sudden quarrel without malice prepense then such killing was manslaughter. It was objected that there should have been inserted after the word "evidence" the words "beyond a reasonable doubt."

  *Held:* That as the subject of reasonable doubt was fully covered by another instruction given by the court, there was no merit in the objection.

17. HOMICIDE—*Instructions—Profane or Abusive Language.*—In a prosecution for homicide the court refused an instruction that the law gives no man the right to curse or swear in front of another man's place of business in a public road during business hours.

  *Held:* No error. The mere fact that the deceased did such cursing and swearing would not justify, excuse or palliate the offense of the accused in killing him.

18. CRIMINAL LAW—*Instructions—Duty of Jury—Principles Understood by Everyone.*—In a prosecution for homicide the court refused to give an instruction upon the responsibility of the jurymen, and that each juror should realize that his own mind must be convinced beyond a reasonable doubt, and that if after consultation with his fellow

jurors a juror entertained a reasonable doubt, it was his duty not to give up his own opinion simply because the jury were of a different opinion.

*Held:* That the instruction might probably have been given with propriety, but it embodied principles so well understood and so fully covered by the oath of each juror that its refusal could not be deemed error.

19. JURY—*Duty of Jurors.*—No juror should ever yield a conscientious opinion deliberately formed after a full and fair investigation of the case, as to the guilt or innocence of the accused, but jurors should not be invited to disagree if they can.

20. JURY—*Duty of Jurors.*—The jury room is no place for pride of opinion or obstinacy. It is the duty of the jurors to discuss the evidence in a spirit of fairness and candor with each other, and, if it can be done without a sacrifice of conscientious convictions, to agree upon a verdict.

21. INSTRUCTIONS—*Directing Verdict on Partial View of the Evidence.*—It is error to give an instruction directing a verdict upon a partial view of the evidence.

22. HOMICIDE—*Instructions—Directing Verdict on Partial View of the Evidence—Case at Bar.*—In the instant case, a prosecution for homicide, the court refused to give instructions for the accused which omitted all reference to the origin of the controversy; to the fact that deceased disclaimed the application of offensive words used by him to the prisoner; to the fact that the prisoner compelled deceased to take his hands out of his pockets, and to an assault made upon deceased by the accused.

*Held:* That the trial court committed no error in refusing to give the instructions.

23. INSTRUCTIONS—*Request to Court to Modify Instruction—Instruction by Court on its own Motion.*—On a trial for homicide, after the trial court had refused to give an instruction offered by counsel for accused, counsel requested the court to modify the instruction to conform to the court's view, and to give an instruction of its own motion on the subject of self-defense. This the trial court refused to do.

*Held:* No error.

24. INSTRUCTIONS—*When Instructions Should be Given—Amendment and Modification—Correction by Court.*—If an instruction is right and there is evidence to support it, it should be given. If it be equivocal, it should be amended. If it be wrong in form or substance, it should be rejected, and there is no obligation on the court to correct it and then give it. A party cannot, by asking an erroneous instruction, devolve upon the court the duty of charging the jury on the law of the case. But if the point upon which the instruction asked is a vital one, the jury should not be left wholly in the dark as to what the law on the subject is.

25. HOMICIDE—*Self-Defense—Difficulty Brought on by the Accused.*—Homicide in self-defense may be either justifiable or excusable. If it is either, it entitles the prisoner to an acquittal. But if the difficulty is brought about by the accused and he finds that it is necessary to kill his assailant in order to save his own life, such killing is not in the eye of the law excusable.

26. HOMICIDE—*Self-Defense—Necessity of Instruction on Self-Defense.*—Where upon the whole evidence it was plain that accused brought on the trouble resulting in the homicide, and even accepting accused's own statement of what occurred at the time of the shooting, it was so plain that he brought about the affray resulting in the death of the deceased that reasonably fair-minded men could not entertain different opinions on the subject, accused is not entitled to an instruction on self-defense.

27. HOMICIDE—*Murder or Manslaughter—Provocation—Sharp Words.*—Sharp words do not constitute adequate provocation to reduce a killing by the use of a deadly weapon from murder to manslaughter.

28. HOMICIDE—*Assault—Self-Defense—Fault of Assailant.*—The general rule is that one cannot provoke an attack, bring on a combat, and then slay his assailant, and claim exemption from the consequences on the ground of self-defense. No one can avail himself of the plea of self-defense, in a case of homicide, or assault with intent to murder, when the defendant was himself the aggressor, and willfully brought on himself, without legal excuse, the necessity for the killing, or the assault made.

29. HOMICIDE—*Self-Defense—Argument of Counsel—Where Court has Decided that there is no Case of Self-Defense.*—When the trial court has decided that no question of self-defense was involved in the case, counsel for accused had no right to make an argument before the jury contrary to the instructions of the court.

30. CRIMINAL LAW—*Questions of Law and Fact—Jury not Judges of the Law.*—In Virginia the jury are not judges of the law in criminal cases any more than they are in civil cases.

31. ARGUMENTS OF COUNSEL—*Dispute between Counsel as to Testimony of Witnesses—Reference to Jury.*—Where in a criminal case there was a dispute between counsel as to whether or not a certain statement had been made by the accused, the court properly said that whether or not such a statement had been made was a matter for the jury. If it had been desired, the argument could have been suspended long enough to refer to the notes of the testimony and verify what the accused had stated, but no such request was made, and in view of the situation there was no error in the ruling of the court.

32. HOMICIDE—*Argument of Counsel—Opinion of Counsel.*—A statement by the attorney for the Commonwealth on a trial for homicide that the only question the jury had to determine was whether or not it was murder of the first or second degree was merely an expression of

opinion by him and allowable. It was not a statement of the testimony in the case but his deductions from what that testimony showed.

33.  HOMICIDE—*Argument of Counsel—Retreat.*—In a prosecution for homicide where there was no dispute about the fact that accused did not retreat, accused could not have been prejudiced by a statement in the argument of the attorney for the Commonwealth that before a man can claim self-defense he has got to retreat.

34.  INSTRUCTIONS—*Scintilla Doctrine—Criminal Cases.*—The scintilla doctrine is repudiated in Virginia in criminal as well as in civil cases. In a civil case an instruction will not be given where there is so little evidence to support it that the verdict in favor thereof would have to be set aside for lack of evidence to support it. As a verdict of not guilty cannot be set aside, it would seem that the reason for refusing to apply the doctrine was, at least, as strong in a criminal case as in a civil case.

Error to a judgment of the Circuit Court of Botetourt county.

*Affirmed.*

The opinion states the case.

*Benjamin Haden,* for the plaintiff in error.

*John R. Saunders, Attorney-General, J. D. Hank, Jr., Assistant Attorney-General,* and *Leon M. Bazile, Second Assistant Attorney-General,* for the Commonwealth.

BURKS, J., delivered the opinion of the court.

Houston Sims was convicted of murder in the second degree, and sentenced to the penitentiary for a term of twenty years. The murder occurred in the public road immediately in front of a small store that was conducted by the accused. The road is a narrow country road and nearly entirely occupied by the roadway.

Peter Philpot, who was killed, and the accused, and all of the eye witnesses to the killing—in fact, practically all of the witnesses in the case—were negroes, and

the differences between the witnesses as to what they observed at the time of the trial is such that it is not easy to state the facts exactly.    There was testimony on behalf of the Commonwealth of previous threats which Sims had made against the deceased, and Sims himself says that, during the watermelon season, when he sent a message to Dorothy Philpot to accompany him to the watermelon patch, the deceased poked his head out of a window and told the messenger to tell Sims to go to hell.    Sims having overheard this called out, "If you have got anything against me why don't you come out in the road and tell me yourself?"    He testified, however, at the trial, that the deceased had been to his house several times after that, and he always spoke every time they met, and there did not seem to be anything wrong with him, and he (Sims) knew there was not anything wrong with himself.    His account of what took place at the time of the shooting, as given in connected form, is as follows:

"Yes, Jennie Hunt, she came, and we was all there laughing and talking, and when he came in that night, when Peter came in that night, just before he came in my brother had sent me my supper, and I had been to Roanoke that day and I had bought me some fish, and I was standing there eating, and Jennie asked me to give her a piece of fish, and I gave it to her, and then Lucy Jane asked Jennie to give her a piece and she gave it to her, and Dorothy was standing there, too, and Peter Philpot walked in and spoke, and we all spoke, and he says, 'Lucy Jane, when are you going home?'    She says, 'I am going now just as soon as I finish eating this fish.'    He says, 'Yes, and I am going to burn you up for being up here,' and I was standing behind the counter and I never did quit eating; I stayed there, and he walked on outside, and when he

got outside he addressed grossly obscene language to her, which is unfit to print, which was a threat of violence to her as well as to those whom he characterized as 'the rest of these damned, dirty sons of bitches that are laying up around here with you,' and when he said that I come on out and reached down in the corner and got my gun. I had my gun in my right hand, and I said, 'Peter, don't use that kind of language in front of my place.' I says, 'I wouldn't use that kind of language in front of your place,' and he says, 'I didn't call you a son of a bitch, but I did say I was going to burn her up (using the same obscene language), with some of the rest of you dirty sons of bitches,' and he threw his hand to his hip pocket, and when he threw his hand to his hip pocket I shot."

After making this statement, in response to a leading question by his counsel, he said, "When he threw his hand to his hip pocket I was satisfied that he was going to shoot me and that is why I shot. I thought I was justified in trying to protect myself." In testifying more in detail as to what occurred at the time of the shooting, he says that when the deceased threw his hand on his pocket he understood him to say, "I am going to make you shoot that God damn shot gun." Some question had been asked him with reference to the time he had to look around while he was "out there in this fuss with Philpot," to which he replied that he did not have plenty of time to look around there; and afterwards, in a further answer not directly responsive to a question propounded to him, he said: "Now, when I was out there talking to Peter, I had no time to look around to see who was coming up the road or down the road because I did not want to take any chance with my life any more than you would want to take chances with yours." The court then propounded to

him two questions, which with the answers thereto are as follows:

"Q. What did you bring the shot gun out there for?

"A. I brought it out there so if he had anything he wouldn't do anything to me.

"Q. You were not in any danger in the house, were you?

"A. I came out there, I wanted to ask him to go away, and I wanted some protection while I was out there."

It is conceded that Lucy Jane Philpot, the wife of the deceased, and Dorothy Philpot, her daughter, and Jennie Hunt were also eye witnesses to the shooting. Another witness introduced by the Commonwealth, Fred P. Anderson, also claims to have been an eye witness to the shooting, but this fact was controverted by the accused. Dorothy Philpot's account of what took place was that the deceased came into the store with his hands in his pockets and said to her mother, "Come on and go home." That she replied, "Just as soon as I get through eating this fish," and the deceased walked out of doors with his hands in his pockets, and said, "Come on and go home," and that his wife replied, "I will as soon as I get through eating this fish," to which the deceased responded, "I am going to burn you up, you and some other of these sons of bitches," and then that Sims ran out with his gun and said, "Don't use that language outside of my place." To which the deceased responded, "I have not called your name, I was talking to Lucy Jane," and he made the deceased take his hands out of his pockets, and when he took his hands out of his pockets the deceased said, "Houston, you got your gun, and if I had mine I'd make you shoot yours, and that, when the deceased said that, Sims struck him and the deceased struck

him back, and at that time Sims fired and the deceased fell. This witness makes no mention of any motion by the deceased to draw a gun from his hip pocket.

Lucy Jane Philpot, wife of the deceased, gave practically the same account of what took place as that given by Dorothy Philpot, except that she did not see the blows pass between the accused and the deceased mentioned by Dorothy; but she says that the language used by Philpot immediately before the shot was fired was, "I have not got no gun; If I had my gun I would make you shoot yours," and that then the accused fired. Jennie Hunt, who did not appear to be related to either the deceased or the accused, says that when Philpot came into the store he said "Good evening," and all of them spoke to him, and he said, "Lucy Jane, come on and go home," to which she replied, "All right, Peter, just as soon as I get through eating some fish," and that he walked out of the store and after he got out he called, "Come on, Lucy Jane, and go home," and she says, "I am coming home, Peter, as soon as I eat my fish." He replied, "Damn you, I am going to burn you up, you and some of the rest of these sons of bitches where you are up ·here with." That the accused then came from behind the counter with a shot gun and said, "Peter, I would not curse before your store like that," and Peter repeated substantially what he had said, and then Sims struck Philpot and Philpot struck Sims and Philpot threw his hand back to his hip pocket and said, "If I had my damn gun I would make you shoot your God damn shot gun," and then Sims shot him. This witness further testified that when Philpot got out of the store he stood on the ground right in front of the door; that the accused did not have his gun up when he went out of the store, but had it in one hand by his side, and when asked if

he had his gun drawn on the deceased at the time the blows were struck, she replied, "No, he did not have it drawn on him because he could not draw it on him when he was striking him with his fist," and when asked if the gun went off before the accused had gotten it to his shoulder she replied, "No, sir; it did not go off before he got it to his shoulder." The witness also testified that the body of the deceased was allowed to lie where it fell from the time of the shooting, about seven o'clock in the evening, until the next morning, and that when it was removed there was found under it a small pocket knife with a little white bone handle; that it had two blades and one of them had been broken, but the other was open, and that this blade was about "as long as your little finger." The testimony of the witness, Fred Anderson, will be referred to later.

The accused in his testimony makes no reference to any threats that had been made against him by Philpot, nor to the assault with his fists upon the deceased, testified to by other witnesses, nor to making Philpot take his hands out of his pocket. He was not interrogated on this subject, either by his own counsel or the attorney for the Commonwealth.

There are fourteen assignments of error, but the third, fifth, seventh and tenth were abandoned at the hearing on the oral argument. The verdict of the jury is so plainly supported by the evidence that it is unnecessary to notice the first assignment of error that the verdict was contrary to the law and the evidence.

[1-3] The second assignment of error is to the action of the trial court in refusing to continue the case from the special term which began on October 26, 1921, at which the accused was indicted, to the regular term of the court, December 1, 1921. This motion was made on October 26, 1921, and based on the ground "that

there was no opportunity for said counsel (for the ac-
cused) to investigate fully this said case, and to sum-
mon the necessary witnesses," as counsel had criminal
cases set for every day, one after another, of the special
term.   The court announced that it would adjourn on
Friday, October 28th, and would not reconvene until
Monday morning, October 31st, and set the case for
trial on November 2nd, and postponed the hearing of
the motion until that date, saying to counsel, "That
the said defendant could then renew his motion for a
continuance of the case, if at that time his counsel had
been unable to make a full and fair investigation of
said case, in order to ascertain what witnesses to be
summoned on behalf of the defendant."   The motion
was renewed on November 2nd, supported by two affi-
davits and the sworn statement of his counsel as to
their engagements in the court, and the fact that coun-
sel had only been employed a "few days" before the
commencement of the special term.   Affidavit No. 1,
related to the efforts of counsel to investigate the case
and ascertain what witnesses to summon, and their
inability to accomplish the desired results in the time
limited.   This furnished no sufficient ground for the
continuance of the case.   While courts should afford
those accused of crime a reasonable opportunity to em-
ploy counsel and prepare their cases for trial, the call-
ing of the docket and the trial of cases cannot be made
subservient to the convenience and engagements of
counsel in other cases.   The offense was committed
October 6th, the indictment was found October 26th,
and counsel were employed "a few days" before the
term began.   On October 26th the case was set for
hearing on November 2nd, and every eye witness of
the killing was present and examined on the trial.   The
matter of what time should be allowed counsel for the

accused to prepare the case rests in the sound discretion of the trial court, with which this court will not interfere except in case of abuse, and in this case we do not think the discretion was abused. *Ivey* v. *State* (Ga.), 113 S. E. 175; *Berentz* v. *Belmont Oil M. Co.*, 148 Cal. 577, 84 Pac. 47, 113 Am. St. Rep. 308; *Hite* v. *Com.* 96 Va. 489, 31 S. E. 895; *Payne* v. *Zell*, 98 Va. 294, 36 S. E. 379; *Matoaka Coal Corp.* v. *Clinch Valley M. Corp.*, 121 Va. 522, 93 S. E. 799.

[4, 5] Affidavit No. 2, relied on to support the motion for a continuance, set forth the absence of one E. H. Hunt by whom the prisoner expected to prove that on the morning of the day of the homicide the witness told him that the deceased had said to Hunt that the first time he "got an excuse or a chance he was going to kill this man Sims, the defendant." It may be conceded that a *bona fide* effort was made to secure the presence of this witness and that the same facts could not have geen proved by any other witness, but the accused was not prejudiced thereby. The accused went on the stand and testified in his own behalf, and never intimated that any threats had been communicated to him, nor was he asked a question on the subject. Moreover, since threats by one to take the life of another will not justify the latter in taking the life of the former prior to any overt act towards carrying the threats into effect, and not even then until the killer has first done all in his power to avoid the necessity of the killing, if he was at fault in bringing on the combat (1 Bish. New Cr. Law [8th ed.], secs. 869 (3) and 870), even if this witness had been obtained and had testified as expected and his testimony had been believed by the jury, that would not have made the case one in which the accused could rely upon the plea that he acted in self-defense in killing the deceased. The refusal of the

court, therefore, to continue the case because of the absence of this witness was harmless error, if error at all.

The third assignment of error was abandoned.

[6, 7] The fourth assignment of error relates to the statement made by Fred P. Anderson, a witness for the Commonwealth, when on cross-examination by counsel for the accused. On his examination in chief, in relating what occurred at the time of the shooting, the witness stated that he had said to Lucy Jane Philpot, wife of the deceased, "Here is a man lying here dead without any cause." Objection was made by counsel for the prisoner and the court ruled out the statement, remarking that it was not evidence. On the cross-examination counsel for the accused again questioned the witness as to what took place at the time of the shooting, and especially as to whether he saw Lucy Jane Philpot and what she was doing, and in answer to one of the questions put by the counsel for the prisoner the witness, though not categorically answering the question put, amongst other things, stated, "I got through the fence and came to Lucy Jane and says, 'Lucy Jane, here is a man laying dead without a cause.'" Counsel for the prisoner said, "The court has told the witness not to tell that. We ask the court to instruct the jury to disregard that." The judge replied, "The court can't keep on instructing the jury. You are cross-examining and you keep asking those questions." Whereupon the prisoner excepted. This answer came out upon the persistent cross-examination by counsel for the accused, and the insinuation on the part of counsel for the prisoner that the witness was not present at the time of the shooting. The whole cross-examination of this witness was in the nature of an impeachment and laying the foundation to contradict him by other witnesses, and during his cross-examina-

tion, and in the presence of the jury, counsel for the prisoner said, "I am going to impeach him." The prisoner contended that the witness, Anderson, was not present at the time of the shooting, and the course of the cross-examination was along the line of supporting this contention. That a witness may be impeached by the character of his cross-examination was held by this court in the case of *George* v. *Pilcher*, 28 Gratt. (69 Va.) 299, 26 Am. Rep. 350. In *Hoffman* v. *Lemm* (Tex. Civ. App.), 106 S. W. 712, 716, it is said: "It may be that the answer was not categorically responsive to the interrogatory propounded to witness; but when we take into consideration the nature of the questions embodied in that interrogatory, their argumentative character and the evident intent to convict the witness, if possible, out of his own mouth, of both moral and legal wrongs * * we do not think the court erred in refusing to strike it out. When an attack such as was couched in those questions is made upon a witness, it is but natural that he should seek to defend himself by narrating such facts within his knowledge as are calculated to have that effect." The statement quoted was not hearsay evidence, but the mere opinion of the witness. This is manifest from the answer itself, and coming from an ignorant negro could have had no particular weight with an intelligent jury. The remarks of the judge show that the answer had been evoked by the persistent cross-examination, and counsel for the prisoner could not expect otherwise if he continued that character of cross-examination. We are of opinion that the prisoner could not have been injured by the opinion of this witness. Certainly the refusal to strike out that portion of his answer was not reversible error.

The fifth assignment of error was abandoned.

[8] The sixth assignment of error refers to the action

of the trial court in permitting certain questions to be asked by the prosecuting attorney to one of the witnesses, on the ground that the questions were leading and suggestive, and were asked for the purpose of having the witness qualify a previous unequivocal statement he had made. During the cross-examination of this witness and after a number of questions had been asked on cross-examination by counsel for the defendant, the court asked the witness, "Did you tell Mr. Haden that Fred Anderson was not there at the time of the shooting?" To which the witness replied, "I told him that he was not there when the shooting was done, but he was the first one come up after my husband fell." Thereupon the attorney for the Commonwealth asked the witness the two questions recited below, to which questions and any answer thereto the prisoner by counsel objected. The questions and answers referred to were as follows: "Q. When you told Mr. Haden up there that Fred Anderson was not there, did you mean that he was there or that he was not there?" "A. I did not see Fred Anderson in sight until the shooting was done." "Q. You do not undertake to tell the jury that he was not there, but that you did not see him there?" "A. No, sir." The statement of the witness that Fred Anderson was not present was not unequivocal. It may have meant that for some reason she knew that he was not present and could not have been present, or she may have meant simply that if he was present she did not see him. The object of the question by the prosecuting attorney was to clear up this ambiguity, and was for that purpose legitimate. The questions by the attorney for the Commonwealth were merely for an explanation, certainly the first question was not leading, and the second one was merely explanatory of the preceding answer and em-

phasized the explanation.     The prisoner could not have been injured thereby.

The seventh assignment of error was abandoned.

The eighth assignment of error was to the action of the court in granting the following instruction of its own motion:

"The court instructs the jury that the law presumes every prisoner to be innocent until his guilt is established beyond a reasonable doubt. (2) That every homicide is presumed to be murder in the second degree and the burden of proving the elements necessary to elevate the crime to murder in the first degree is upon the Commonwealth, but on the other hand in order to reduce the offense from murder in the second degree to manslaughter or excusable homicide, the burden is upon the prisoner.

"If the killing of a human being be malicious but not willful, deliberate or premeditated, then such killing is murder in the second degree.

"Mere words, however grievous, will not justify an assault."

[9-11] Two objections were made to this instruction. The first is that so much of the instruction as states that "in order to reduce the offense from murder in the second degree to manslaughter or excusable homicide the burden is upon the prisoner," is not a correct statement of the law.     This statement of the law is hoary with age and has been followed without criticism or objection in this jurisdiction for nearly a century. A partial list of the cases in which it has been approved is given in the margin.*     If in its practical application it had proved unfair or injurious to persons accused of

---

*Hill's Case* (1845) 2 Gratt. (43 Va.) 595; *McWhirt's Case,* 3 Gratt. (44 Va.) 594, 46 Am. Dec. 196; *Bristow's Case,* 15 Gratt. (56 Va.) 634; *Honesty' Case,* 81 Va. 284; *Hodges' Case,* 89 Va. 265. 15 S. E. 513; *Horton's Case,* 99 Va. 848, 38 S. E. 184; *Litton's Case,* 101 Va. 833, 44 S. E. 923; *Potts' Case,* 113 Va. 732, 73 S. E. 470; *Bryan's Case* (1921) 131 Va. 709, 109 S. E. 477; *Jacobs' Case* (1922) 132 Va. 681, 111 S. E. 90.

homicide, it is more than probable that the fact would long ago have been discovered by the bar and the bench.   It has proven satisfactory in the administration of justice and not hurtful to those accused of homicide, and we have no disposition to depart from it. Perhaps it would have been more accurate to say that every *unlawful* homicide is presumed, etc.   But the addition of the word "unlawful" would probably simply provoke discussion, and we see no occasion to change the phraseology in which the rule of law has heretofore been stated, and which has proven so satisfactory in its practical operation.   When it is said that "the burden is upon the prisoner" to reduce the offense from murder in the second degree to manslaughter or excusable homicide, all that is meant is that it is incumbent upon the prisoner to introduce evidence sufficient to raise a reasonable doubt in the minds of the jury as to whether the offense is murder in the second degree. When this amount of evidence has been introduced, the prisoner has fully carried the burden which is placed upon him by the instruction.   The prisoner is entitled to the benefit of a reasonable doubt arising from the evidence of the Commonwealth as well as from his own evidence.   If it arises from the evidence of the Commonwealth, there is nothing to overcome, but unless it does so arise the presumption continues until overcome by evidence on behalf of the prisoner which raises a reasonable doubt as to the guilt of the prisoner of the particular offense presumed.   The prisoner is as much entitled to the benefit of a reasonable doubt on the degree of his offense as he is to said doubt as to his guilt or innocence.

These principles are well illustrated by the instruction which was approved in *Litton's Case,* 101 Va. 833, 44 S. E. 923.   There, to the usual instruction as to the burden of proof in homicide cases, there was added:

48

"Yet when the evidence is all in, then, if the evidence, both for the Commonwealth and the accused, leave a reasonable doubt as to the guilt of the accused, the jury must find the prisoner not guilty." This ruling was approved in the *Potts Case,* 113 Va. 732, 73 S. E. 470. In the latter case the report does not show that there was any instruction on reasonable doubt and the extent of the application of that doctrine. The jury in the case at bar was fully and properly instructed as to reasonable doubt by instruction six given by the court, which is in these words:

"The court instructs the jury that the prisoner is presumed to be innocent of the crime charged against him until his guilt is established by the evidence beyond every reasonable doubt, and the court further instructs the jury that this presumption of innocence goes with the prisoner throughout the entire trial, and applies to every stage thereof."

[12, 13] Instructions ought to be read as a whole and when the above mentioned instruction is read in connection with instruction six, it is difficult to understand how the jury could have had any doubt on the subject. The prisoner never has to prove any fact either beyond a reasonable doubt or by a preponderance of the evidence. All he has to prove in any case is such a state of facts as will raise a reasonable doubt in the minds of the jury as to the existence of the fact or facts sought to be established by the Commonwealth, and this was sufficiently stated in instruction six. If counsel for the prisoner had any doubt on this subject, all he had to do was to ask the court for a fuller or more particular statement as given above, and it would doubtless have been accorded him. In the absence of such a request the instruction itself is an adequate statement of the law for the guidance of the jury.

[14, 15] The latter part of the instruction is, "If the killing of a human being be malicious, but not willful, deliberate or premeditated, then such killing is murder in the second degree." By apparently a mere clerical error the word *or* is substituted for *and* before the word "premeditated." It is argued by counsel for the prisoner that by the use of the word *or* the "jury were in effect instructed that a malicious and willful homicide was not murder in the second degree, but was murder in the first degree, when the very statute defining murder in the first degree provides that in order for homicide to be murder in the first degree the killing must be willful, deliberate *and* premeditated." We are unable to follow the reasoning of counsel by which he undertakes to show that this part of the instruction was prejudicial to the accused. Every *malicious* homicide is murder. If, in addition, the killing be willful, deliberate *and* premeditated it is murder in the first degree. So are the cases specifically enumerated in the statute. All other murder is murder of the second degree. Code, section 4393. The case at bar is not within the enumerated cases. The instruction told the jury that if the killing was malicious "but not willful, deliberate or premeditated," it was murder of the second degree. The jury could not have been misled to the prejudice of the accused by the error aforesaid.

[16] The ninth assignment of error is to the action of the trial court in giving to the jury the following instruction on the subject of manslaughter: "The court instructs the jury that if they believe from the evidence that the prisoner killed Ph lpot on a sudden quarrel without malice prepense then such killing is manslaughter." The only objection to the instruction is that there should have been inserted after the word "evidence" the words "beyond a reasonable doubt."

The objection is without merit.    The subject of reasonable doubt was fully covered by instruction six given by the court, and hereinbefore set forth.

The tenth assignment of error was abandoned.

[17]  The eleventh assignment of error is to the action of the trial court in refusing instructions 9, 11 and 12, tendered by the accused.    What was said in discussing assignment of error No. 9 shows that no error was committed in refusing instruction No. 11 tendered by the accused.    Instruction No. 9 was as follows:

"The court instructs the jury that the law gives no man the right to curse or swear in front of another man's place of business in the public road during business hours."

This instruction needs no discussion.    The mere fact that the deceased did such cursing and swearing would not justify, excuse or palliate the offense of the accused in killing him.

[18-20]  Instruction No. 12 is as follows:    "The court instructs the jury that upon the trial of a criminal case in which the defendant is charged with the commission of a crime, as in the instant case, the law contemplates the concurrence of twelve minds in the conclusion of guilt before a conviction can be had; each and every juror must be satisfied beyond every reasonable doubt of the defendant's alleged guilt before such juror can under his oath consent to a verdict of guilty.    Each and every juror should feel the responsibility resting upon him as a member of the jury, and each and every juror should realize that his own mind must be convinced beyond every reasonable doubt of the defendant's alleged guilt before such juror can, under his oath, consent to a verdict of guilty.    Therefore, if any juror after having duly considered all the evidence in this case, and after a consultation with his fellow jurors,

should have a reasonable doubt of the defendant's alleged guilt as set forth in certain other instructions in this case, it is the duty of such juror not to give up his own opinion simply because the balance of the jury have different opinions."

This instruction is substantially the same as instruction No. 23, given in the *McCue Case*, 103 Va. 870, 916-17, 49 S. E. 623. But in that case the instruction was given at the instance of the prisoner without objection on the part of the Commonwealth, and no objection thereto was or could have been made in the appellate court by the Commonwealth. The court was there considering errors alleged by McCue to have been committed to his prejudice and of course the giving of that instruction, at his instance, was not one of said errors. The instruction might probably, with propriety, have been given, but it embodies principles so well understood by everyone and so fully covered by the oath of each juror that its refusal cannot be deemed error. No juror should ever yield a conscientious opinion deliberately formed after a full and fair investigation of the case, as to the guilt or innocence of the accused, but jurors should not be invited to disagree if they can. When such an instruction is given, the jury should be further instructed that the jury room is no place for pride of opinion or obstinacy, but that it is the duty of the jurors to discuss the evidence in a spirit of fairness and candor with each other, and with open minds to give careful consideration to the views of their fellows, and, if it can be done without a sacrifice of conscientious convictions, agree upon a verdict. "By such means and such only, in a body where unanimity is required, can safe and just results be attained, and without them trial by jury, instead of being an essential aid in the administration of justice, would be

a most effective obstacle to it." *Commonwealth* v. *Tuey*, 8 Cush. (Mass.) 1; *Odette* v. *State*, 90 Wis. 258, 62 N. W. 1054; *Jackson* v. *State*, 91 Wis. 253, 64 N. W. 838.

The twelfth assignment of error is to the refusal of the trial court to give instructions 10 and 13 tendered by the accused.

Instruction No. 10 was as follows: "The court instructs the jury that if they believe from the evidence that Philpot cursed in front of Houston Sims' store on the night in question, and that Sims immediately took up his shotgun and went out in front of his store where Philpot was and asked Philpot not to curse in front of said store; and if the jury further believe from the evidence that after Sims got on the outside of the store that he and Philpot had some words, and that Philpot made some remark to Sims to the effect that he was going to make Sims shoot his gun, and if the jury further believe from the evidence that at the time that said Philpot made said statement to Sims that said Philpot immediately reached his hand toward his hip pocket; and if the jury further believe from the evidence that Sims then believed that said Philpot was reaching for a pistol or other instrument to inflict serious bodily harm upon said Sims immediately, and that acting under said belief the said Sims fired his shotgun and killed Philpot, then the jury should find the defendant not guilty."

Instruction No. 13 is substantially the same as instruction No. 10, with this addition near the end thereof as a substitute for the words after the word "immediately:" "* * and if the jury further believe from the evidence that a reasonable person under such circumstances would have concluded that said Philpot was about to inflict serious bodily injury upon Sims

immediately, and that acting under said belief the said Sims fired his said shotgun immediately and killed Philpot, then the jury should find the defendant not guilty."

[21, 22] It has been repeatedly held by this court that it is error to give an instruction directing a verdict upon a partial view of the evidence. *Montgomery* v. *Commonwealth*, 98 Va. 852, 37 S. E. 1, and cases cited. For full citation of cases, see Burks' Pl. & Pr. (2d ed.) p. 496, note 15. Both of these instructions are amenable to that objection. Each omits all reference to the origin of the controversy; to the fact that Philpot disclaimed the application of the words used by him to the prisoner; to the fact that the prisoner compelled Philpot to take his hands out of his pockets, or to the assault made upon him by the accused. The whole setting of the case is changed, especially by the omission of any reference to the origin of the difficulty, and if either of these instructions had been given, and the jury, in pursuance thereof, had found the defendant not guilty, the result would have been that he would have been tried upon one state of facts and acquitted upon another. The trial court, therefore, committed no error in refusing to give either of said instructions.

[23-27] After said refusal, however, counsel for the prisoner requested the court to modify the instruction to conform to the court's view, and to give an instruction of its own motion on the subject of self-defense. This the trial court refused to do. A similar request was made in the civil case of *Ches. & O. R. Co.* v. *Stock*, 104 Va. 97, 51 S. E. 161, and it was there held that "If an instruction is right and there is evidence to support it, it should be given. If it be equivocal, it should be amended. If it be wrong in form or substance, it should be rejected, and there is no obligation on the court to correct it and then give it. A party cannot,

by asking an erroneous instruction, devolve upon the court the duty of charging the jury on the law of the case." In the main we concur in this statement of the law, but with this qualification, that if the point upon which the instruction asked is a vital one, the jury should not be left wholly in the dark as to what the law on the subject is. Burks' Pl. & Pr. (2d ed.), p. 493. The trial court, however, did not think that the question of self-defense was involved in the case and therefore refused either to give the instruction tendered, or to accept the other invitations extended by counsel for the prisoner. Homicide in self-defense may be either justifiable or excusable. If it is either, it entitles the prisoner to an acquittal. But if the difficulty is brought about by the accused and he finds that it is necessary to kill his assailant in order to save his own life, such killing is not in the eye of the law excusable. A man cannot go a-gunning for an adversary and kill him on the first appearance of resistance, and rely upon the necessity of the killing as an excuse therefor. If we accept the prisoner's own statement of what occurred at the time of the shooting, it is so plain that he brought about the affray resulting in the death of the deceased that reasonably fair-minded men could not entertain different opinions on the subject, and if the whole evidence be considered, it is very plain that he brought on the trouble. Viewing the evidence in the most favorable light to the prisoner, he was in a place of perfect safety when he picked up his gun and walked out in front of the store and practically ordered Philpot away. His language was, "Peter, don't use that kind of language in front of my place." The deceased disclaimed using the language about the accused, and according to the testimony of the latter, threw his hand to his hip pocket, and when he did this the accused fired and

killed him.    There had been nothing prior to that time
to indicate that the deceased was seeking trouble with
the accused.    His language was not addressed to the
accused, but addressed especially to the wife of the de-
ceased.  And even if it had been addressed to the ac-
cused, it is held in *Reynolds* v. *Com.* 133 Va. 760, 112
S. E. 707, that sharp words do not constitute adequate
provocation to reduce a killing by the use of a deadly
weapon from murder to manslaughter.

In *Jacobs' Case,* 132 Va. 861, 111 S. E. 90, it is said:
"It must be remembered, however, that provocation
cannot be relied upon to reduce murder in the second
degree to manslaughter, unless the provocation has so
aroused the anger of the assailant as to temporarily
affect his reason and self-control."

In *Vaiden's Case,* 12 Gratt. (53 Va.) 717, 729-30, it
was said: "And with regard to the necessity that will
justify the slaying of another in self-defense, it would
seem that the party should not have wrongfully occa-
sioned the necessity, for a man shall not in any case
justify the killing of another by a pretense of necessity,
unless he were without fault in bringing that necessity
upon himself."    The facts of the *Vaiden Case* were very
much stronger in favor of the prisoner than in the case
at bar.    The holding in the *Vaiden Case* was fully ap-
proved by this court in *Jackson's Case,* 98 Va. 845, 36
S. E. 487.    See also the latter case with note distin-
guishing justifiable homicide and excusable homicide,
6 Va. Law Reg. 176.

[28] In 1 Michie on Homicide, section 112, it is said:
"The general rule is that one cannot provoke an attack,
bring on a combat, and then slay his assailant, and
claim exemption from the consequences on the ground
of self-defense.    No one can avail himself of the plea
of self-defense, in a case of homicide, or assault with

intent to murder, when the defendant was himself the aggressor, and willfully brought on himself, without legal excuse, the necessity for the killing, or the assault made. He who provokes a personal encounter, in any case, thereby disables himself from relying on the plea of self-defense in justification of a blow which he struck during the encounter. Where the defendant provoked the difficulty, it makes no difference as to what threats were made by the deceased, or what his character may have been for violence, or what may have been the danger to the defendant at the time he fired the shots. The law will not excuse him for the homicide. That decedent did not exercise proper self-control did not make him the aggressor, as affecting accused's plea of self-defense. While in some instances, courts, in setting forth the rule as to the effect of aggression or provocation by the defendant upon his right to kill in self-defense, have made use of the expression 'reasonably free from fault,' yet in other decisions this form of expression has been condemned, and it has been held that, in order that his act may be justifiable as in self-defense, the defendant must have been free from all fault or wrong-doing on his part which had the effect to provoke or bring on the difficulty." A large number of cases from different States are cited by the author to support the text.

It seems plain from the testimony in the case, as said by the trial judge, that no case of self-defense was involved. What the prisoner was entitled to was an instruction on the subject of the reduction of the offense from murder to manslaughter, and this instruction had already been given by the court.

[29, 30] The thirteenth assignment of error is to the action of the trial court in refusing to allow counsel for the defendant to argue the doctrine of self-defense be-

fore the jury.   The record shows that during the argument of the case the court interrupted counsel for the defendant and stated in the presence of the jury that the court had refused to instruct the jury there was self-defense in the case.   There was no error in this action of the trial court.   When the trial court had decided that no question of self-defense was involved in the case, counsel had no right to make an argument before the jury contrary to the instructions of the court. In this State the jury are not judges of the law in criminal cases any more than they are in civil cases. *Brown* v. *Com.*, 86 Va. 466, 10 S. E. 745; *Muscoe's Case*, 86 Va. 443, 10 S. E. 534.   In the *Brown Case*, Judge Lewis quotes from Mr. Justice Story in *United States* v. *Battiste*, 2 Sumn: 240, Fed. Cas. No. 14545, as follows: "My opinion is that the jury are no more judges of the law in a capital or other criminal case upon a plea of not guilty, than they are in every civil case tried upon the general issue.   In each of these cases their verdict in general is necessarily compounded of law and fact, and includes both.   In each they must necessarily determine the law as well as the fact.   In each, they have the physical power to disregard the law as laid down to them by the court.   But I deny that in any case, civil or criminal, they have the moral right to decide the law according to their own notions or pleasure.   On the contrary, it is the duty of the court to instruct the jury as to the law, and it is the duty of the jury to follow the law as it is laid down by the court.   \*   \*   \* If I thought that the jury were the proper judges of the law in criminal cases, I should hold it my duty to abstain from the responsibility of stating the law to them upon any such trial."   The same view is maintained by the Supreme Court of the United States in *Sparf & Hansen* v. *United States*, 156 U. S. 51, 715, 15 Sup. Ct. 273, 39 L. Ed. 343.

[31] The fourteenth assignment of error is to the action of the court in allowing certain statements to be made by the prosecuting attorney in his concluding argument. There are two of these statements to which objection is made. The first is that the attorney for the Commonwealth said that the prisoner "never once testified that he did not make these other statements before Cherokee Bruce and ————," at which point counsel for the prisoner interrupted the argument and objected to the court on the ground that the record did show that the prisoner had denied the alleged statements claimed to have been made by him before the witness, Cherokee Bruce, to which objection of the prisoner's counsel the court replied, "That is a matter for the jury." There was no error in this ruling of the trial court. There was a dispute between counsel as to whether or not a certain statement had been made by the prisoner, and the court very properly said that whether or not such a statement had been made was a matter for the jury. If it had been desired, the argument could have been suspended long enough to refer to the notes of the testimony and verify what the prisoner had stated, but no such request was made, and in view of the situation there was no error in the ruling of the court.

[32-34] The other objection was that the attorney for the Commonwealth, during his concluding argument stated to the jury "before a man can claim self-defense he has got to retreat, and he cannot bring on the thing himself, and if he is in fault in doing that, that is no excuse, so there is no evidence here of self-defense, and it is a clean cut proposition of shooting this man, and the only question that you have got to determine is whether or not it was first degree murder or second degree murder." The statement by the at-

torney for the Commonwealth that the only question
the jury had to determine was whether or not it was
murder of the first or second degree was merely an
expression of opinion by him.   It was not a statement
of the testimony in the case but his deductions from
what the testimony showed.   The other part of the
statement of the prosecuting attorney with reference to
retreat could not have been prejudicial to the accused
in view of the testimony in the case, if it be conceded
that a *bona fide* retreat would have constituted a de-
fense.   The accused through his counsel had announced
time and again that their defense was self-defense, and
in the petition for writ of error in this case counsel
say: "From this argument upon which the court
placed its stamp of approval, the jury were plainly told
that the prisoner could not plead self-defense in this
case because the evidence showed that the prisoner did
not retreat before firing the fatal shot—the fact being
that the prisoner *had no chance to retreat*."   And in the
next paragraph of the petition it is said: "There was
no dispute in this case that before firing the fatal shot
the prisoner did not retreat."   If there was no dispute
about the fact that the prisoner did not retreat, we do
not see how the prisoner was prejudiced by the argu-
ment of the attorney for the Commonwealth.   In fact,
if the prisoner could now rely upon retreat, after his
repeated avowals that he did not rely upon a retreat,
there is very little in the record which would justify
any suggestion of retreat outside of the testimony of
the witness, Anderson, whom the prisoner assailed from
beginning to end as not being present at the shooting.
If anything is left it is a mere scintilla of evidence on
that subject.   The scintilla doctrine has been repudi-
ated in this State.   *Chesapeake & Ohio Ry. Co.* v. *Stock.*
104 Va. 97, 51 S. E. 161.   It is true that the disapproval

of the scintilla doctrine was made in a civil case, but it also applies with full force to criminal cases.   In a civil case an instruction will not be given where there is so little evidence to support it that the verdict in favor thereof would have to be set aside for lack of evidence to support it.   As a verdict of not guilty cannot be set aside, it would seem that the reason for refusing to apply the doctrine was, at least, as strong in a criminal case as in a civil case.

The prisoner has had a fair and impartial trial by a jury free from objection or exception of any kind, presided over by a judge of great learning and large experience in criminal cases.   He has been defended by able counsel who have been diligent in hunting up the evidence, and who have presented every defense that was in any way warranted by the testimony in the case. The ends of justice have been attained, and it only remains for this court to say that it approves the judgment of the trial court.

*Affirmed.*